T.C. Memo. 1997-312


UNITED STATES TAX COURT


LANCE R. AND ELAINE C. LEFLEUR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 720-96.                    Filed July 7, 1997.


        H filed a lawsuit against his former employer
alleging breach of contract, fraud, and the tort of
outrageous conduct.  Among other things, H received a
lump sum of $1 million to settle the suit, and he
incurred $173,542 in legal fees and costs in connection
therewith.  The agreement expressly allocated $800,000
of the $1 million sum to compensatory damages for H's
tort claims on account of personal injuries, including
mental pain and suffering.  The agreement allocated
$200,000 of that sum to one of H's contract claims.
None of the proceeds were allocated to punitive
damages.  Ps included the $200,000 of the settlement
proceeds allocated to the contract claim in their gross
income on Schedule C attached to their Federal income
tax return for 1991.  Ps relied on sec. 104(a)(2),
I.R.C., to exclude the remaining $800,000 allocated to
the personal injury claims from their gross income.  Ps
also allocated the entire amount of attorney's fees and
costs to the contract claim, and deducted those fees
and costs as a Schedule C expense pursuant to sec. 162,

I.R.C.  As R's primary position in the notice of deficiency, R determined that Ps' gross income includes the total amount of settlement proceeds.  R determined that $380,000 was attributable to salary and wages, and an additional $420,000 was characterized as business gross receipts.  Consistent with that allocation, R determined that $107,596 of the legal fees and costs could be deducted as a Schedule C expense, and the remaining $65,946 was a miscellaneous itemized deduction pursuant to sec. 67, I.R.C.  R also set forth an adjustment position which allocated $1 million to salary and wages and nothing to business gross receipts.  In accordance therewith, R determined that all legal fees and costs must be taken as miscellaneous itemized deductions pursuant to sec. 67, I.R.C.

   1.  Held:  None of the proceeds are excludable from Ps' gross income under sec. 104(a)(2), I.R.C., because they were not received on account of a personal injury.

   2.  Held, further, Ps attorney's fees and costs are deductible as a miscellaneous itemized deduction to which the provisions of secs. 67 and 68, I.R.C., are applicable.

Alan E. Rothfeder, Jo Karen Parr, and Carla R. Cole, for petitioners.

John F. Driscoll and Shuford A. Tucker, Jr., for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KÖRNER, Judge:  Respondent determined a deficiency in the Federal income tax of petitioners (Lance R. and Elaine C. LeFleur) for the tax year ended December 31, 1991, in the amount of $283,078.  (Petitioner Elaine C. LeFleur is a party to this proceeding solely because she filed a joint return with her

husband, and the term "petitioner" will be used henceforth to refer to Lance R. LeFleur).

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues remaining for decision are as follows:

(1) Whether $800,000 of the $1 million lump sum paid to petitioner in 1991 in settlement of a suit against his former employer is excludable from petitioners' gross income under section 104(a)(2) as damages received on account of personal injuries. We hold that it is not.

(2) Whether petitioners may deduct legal fees and costs incurred in bringing the suit as Schedule C expenses to the extent that such fees are allocable to taxable income. We hold that they may not.

Some of the facts are stipulated and are found accordingly. The stipulation of facts and the attached exhibits are incorporated herein by this reference. Petitioners resided in Montgomery, Alabama, at the time they filed their petition in this case.

### FINDINGS OF FACT

In 1984, petitioner was hired as vice president for Blount Energy Resource Corp. (BERC), a wholly owned subsidiary of

Blount, Inc. (Blount). In late 1988, Blount decided to develop an information package for the purpose of exploring the potential sale of BERC.

In March 1989, the management of Blount and BERC decided to reduce operating expenses at BERC in anticipation of the possible sale of the subsidiary. As part of the expense reduction plan, BERC's Montgomery-based staff was cut by approximately 50 percent. Approximately 20 employees of BERC's Montgomery office were either discharged or reassigned to other business entities owned by Blount.

As an incentive to many of BERC's remaining employees, including petitioner, and in order to induce them to continue their employment with BERC pending the sale, Blount offered certain bonuses and severance benefits. In so doing, Blount sought to preserve BERC's value as a functioning business while looking for a buyer. Blount's use of incentive packages in such a manner is a common business practice.

The benefits were outlined in a letter from R. William Van Sant (Van Sant), then president and chief operating officer of Blount, to petitioner dated April 6, 1989 (the April 6 letter). The April 6 letter provided a lump-sum bonus equal to 12 months' salary, among other things, in the event that BERC was sold.

Due to petitioner's request, Blount, by letter dated April 27, 1989 (the April 27 letter), offered petitioner an additional arrangement whereby, among other things, petitioner would receive

a cash payment that was tied to the sales price obtained for BERC. On May 2, 1989, petitioner accepted the offer.

On October 23, 1989, a meeting was held between Van Sant and petitioner in which they discussed the possible separation and sale of BERC's domestic and foreign assets (the October 23 meeting). After the October 23 meeting, petitioner grew doubtful of Blount's intent to abide by the arrangement set forth in the April 27 letter. Petitioner's concern led him to contact an attorney, John Bolton (Bolton). On November 3, 1989, a meeting was held to discuss the terms of the April 27 letter (the November 3 meeting). At the conclusion of the November 3 meeting, Van Sant fired petitioner.

Blount ultimately sold all of the assets of BERC in three separate sales, all of which had closed prior to the end of 1991. Blount sold BERC for $38-39 million net of transaction costs. Blount failed to make any payments to petitioner under either the April 6 or April 27 letters.

Petitioner's Action Against Blount, BERC, and Van Sant

On January 22, 1991, petitioner instituted suit against Blount, BERC, and Van Sant (referred to collectively herein as the defendants) in the Circuit Court of Montgomery County, Alabama. The complaint set forth five causes of action. The first and second counts alleged that Blount and BERC had breached their contract with petitioner arising out of the April 6 and April 27 letters. The third and fourth counts alleged that the

defendants fraudulently induced petitioner to enter into the agreement set forth in the April 27 letter (fraud in the inducement) and fraudulently represented to petitioner that they would pay him an incentive commission based upon the sales price of BERC, among other benefits (promissory fraud).  The fifth count alleged that the defendants intended to inflict emotional distress upon petitioner (the tort of outrageous conduct). Petitioner sought compensatory damages, interest, and costs for the breach of contract counts.  Petitioner sought compensatory and punitive damages for the fraud counts, as well as for the tort claim of outrageous conduct.

Bolton agreed to represent petitioner in the suit.  After evaluation of petitioner's various claims against the defendants, Bolton determined that petitioner's best cause of action was for breach of contract arising out of the April 27 letter.

On March 1, 1991, the defendants filed a Notice of Removal to the United States District Court for the Middle District of Alabama, Northern Division, based upon the premise that all of the claims asserted by petitioner were preempted and controlled by the Employee Retirement Income Security Act of 1974, Pub. L. 93-406, sec. 502(a), 88 Stat. 829, 891.

On October 14, 1991, Blount publicly disclosed the unexpected resignation of Van Sant as its president.  Upon Van Sant's resignation, Oscar J. Reak (Reak), a former president of

Blount, returned from retirement to serve as interim president of the company.

The Settlement Negotiations and Agreement

On November 25, 1991, Reak met with petitioner to discuss the possibility of a settlement (the November 25 meeting). Reak had no interest in partially settling the litigation with petitioner and was interested only in a settlement that resolved all outstanding issues. After the November 25 meeting, Reak tendered a written settlement offer to petitioner dated November 27, 1991 (the November 27 offer). Petitioner did not accept the November 27 offer.

Jim Alexander (Alexander), defendant's counsel, was first advised of petitioner's response to the November 27 offer by a telephone call from Bolton the next day, November 28, 1991 (Thanksgiving Day). On Thanksgiving Day, extensive discussions took place between Bolton and Alexander. By the end of the day, Alexander and Bolton reached an agreement in principle for a basis of settlement of the lawsuit (the agreement in principle), and Alexander reported to his clients that the matter had been resolved. On Saturday, November 30, 1991, Alexander faxed a draft settlement agreement to Bolton.

On December 2, 1991, Alexander met with L. Daniel Morris (Morris), Blount's vice president of legal services, and

communicated with Bolton in an effort to finalize a written settlement agreement. Morris and Alexander considered the adversarial nature of the relationship between petitioner and the defendants reduced prior to the execution of this document since an agreement in principle had already been attained.

At this time, petitioner expressed concerns about the tax implications that any settlement of the case would have on him. Alan Rothfeder, another of petitioner's attorneys, advised petitioner with regard to the allocation of the settlement proceeds, and petitioner and his attorneys discussed the settlement allocation issues with defendants. Blount's sole tax concern regarding the settlement of the case was that nothing be done to compromise Blount's ability to deduct any settlement payment. In that regard, Morris, Alexander, and Reak received assurances from Blount's comptroller that the proposed settlement would be deductible by Blount. Alexander, Bolton, and Morris all actively participated in negotiating the final wording of a formal settlement agreement letter.

Petitioner accepted Blount's settlement offer on December 2, 1991 (the settlement agreement). The settlement agreement states in pertinent part as follows:

Dear Lance,

This letter will document the agreement which we have reached, through our attorneys, on November 28, 1991. [Emphasis added.] We agree as follows:

1.   * * * In exchange for the dismissal of * * * [the] lawsuit, * * * Blount will pay to LeFleur the sum of One Million Dollars ($1,000,000) * * *.  This $1,000,000 sum will be payable within five days after the dismissal of that lawsuit.  Blount agrees to pay LeFleur such sum for the following claims asserted by the plaintiff:

A.  the sum of $0.00 for the amounts claimed by LeFleur under the April 6, 1989 letter;

B.  the sum of $200,000 for the commissions due LeFleur under the April 27, 1989, letter plus any future payments due LeFleur under said April 27, 1989, letter * * *;

C.  the sum of $800,000 for LeFleur's tort claims on account of personal injuries and compensatory damages, including mental pain and suffering;

D.  the sum of $0.00 for punitive damages.

Petitioners filed their 1991 Form 1040, U.S. Individual Income Tax Return, on October 14, 1992.  Petitioners excluded from gross income $800,000 of the $1 million lump-sum settlement and reported on Form 8275, Disclosure Statement, attached to their return that this amount was exempt income under section 104(a)(2).  Petitioners included in gross income the $200,000 allocated to the contract claim on Schedule C attached to their return.  Petitioner's occupation was listed as "Commission salesman" on Schedule C.  On line 17 of Schedule C, petitioners deducted $173,542, the entire amount of litigation fees and costs incurred in bringing and settling the suit against the defendants.

On October 12, 1995, respondent issued a statutory notice of deficiency setting forth alternative positions.  As relevant

here, respondent determined in the primary position that $380,000 of the $1 million lump-sum settlement was attributable to salary and wages. Respondent thereby increased petitioners' taxable income by that amount. Respondent also determined that petitioners received $620,000 of the $1 million as business gross receipts, rather than $200,000, as petitioners had reported on their return. Petitioners' taxable income was thereby increased by an additional $420,000. Consistent with that allocation, respondent disallowed $65,946 of the $173,542 of legal fees and costs claimed on Schedule C, and increased petitioners' adjusted gross income (AGI) by that amount. Respondent then augmented petitioners' miscellaneous itemized deductions by $65,946, subject to the 2-percent AGI limitation of section 67. Pursuant to section 68, respondent reduced the amount of itemized deductions otherwise allowable to petitioners since their AGI was more than $100,000 for 1991.

As an alternative position, respondent stated:

if [it] is ultimately determined that the $620,000.00 shown as corrected business gross receipts * * * is not in fact business gross receipts, then it is determined that wages * * * should be increased in the amount of $1,000,000.00 in lieu of the $380,000 * * *. Accordingly * * * taxable income from salaries and wages is increased in the amount of $1,000,000.00 and business gross receipts are decreased in the amount of $200,000.00 * * *.

In connection with that alternative position, respondent further stated:

should the allocation between business gross receipts and wages [set forth in the primary position] change, and/or the allocation between taxable and nontaxable settlement proceeds change, then legal fee allocations [set forth in the primary position] shall also change. Legal fees allocable to nontaxable settlement proceeds shall not be allowed and any allocations between wages and business gross receipts shall result in proportionate allocations between business expenses and miscellaneous itemized deductions.

## OPINION

We must decide whether the express allocation of proceeds contained in the settlement agreement controls the tax effect of such proceeds to petitioners. We must also decide whether legal fees and costs incurred by petitioners in connection with the suit are Schedule C deductible expenses or miscellaneous itemized deductions to the extent that the fees are allocable to settlement proceeds that are includable in income. As a preliminary matter, we must address petitioners' contention that respondent failed to comply with section 7522, and that this alleged failure justifies a shift of the burden of proof to respondent in this case pursuant to Rule 142(a).

## I.  Burden of Proof

Petitioners contend that the notice of deficiency fails to satisfy the minimum standards required under section 7522 and, therefore, the Court should, under Rule 142(a), shift the burden of proof in this action to respondent. In support of their argument, petitioners assert that respondent's reasons for the proposed changes to petitioners' taxable income are not set forth

with sufficient specificity in the notice of deficiency, inasmuch as "only a general explanation" is offered.  Respondent, on the other hand, maintains that the notice of deficiency provides an adequate explanation of adjustments, and thus a shift of the burden of proof is not warranted.  We agree with respondent.

The general rule of law is clear that, upon the issuance of a timely notice of deficiency by respondent, the burden of proving the determinations in such notice to be erroneous is on the taxpayer.  Rule 142(a) states that the burden of proof shall be on the petitioner except as otherwise provided by statute or "determined by the Court".

As relevant here, section 7522(a) provides that any "notice * * * shall describe the basis for, and identify the amounts (if any) of, the tax due".  Section 7522(b) specifies that these provisions shall apply to, among others, any notice "described in section * * * 6212".  See Ludwig v. Commissioner, T.C. Memo. 1994-518.  Section 6212 pertains to notices of deficiency, as here.  Upon examination, the notice of deficiency issued to petitioners specifically provides the primary position determined by respondent, details an alternative position, and calculates a deficiency of $283,078 for petitioners based upon the primary position.

Based on the foregoing discussion, we hold that respondent has met the requirements of section 7522.  We therefore decline

petitioners' invitation to shift the burden of proof in this case to respondent.

II. Excludability of Settlement Proceeds Under Section 104(a)(2)

Except as otherwise provided, gross income includes income from all sources. Sec. 61. In this regard, statutory exclusions from income must be narrowly construed. Commissioner v. Schleier, 515 U.S. 232, 115 S. Ct. 2159, 2163 (1995).

Under section 104(a)(2), gross income does not include "the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness". Section 1.104-1(c), Income Tax Regs., provides that "The term 'damages received (whether by suit or agreement)' means an amount received * * * through prosecution of a legal suit or action based upon tort or tort type rights, or through a settlement agreement entered into in lieu of such prosecution." Thus, an amount may be excluded from gross income only when it was received both: (1) Through prosecution or settlement of an action based upon tort or tort type rights and (2) on account of personal injuries or sickness. Sec. 104(a)(2); O'Gilvie v. United States, 519 U.S. ___, 117 S. Ct. 452, 454 (1996); Commissioner v. Schleier, 515 U.S. at __, 115 S. Ct. at 2164; P & X Mkts., Inc. v. Commissioner, 106 T.C. 441, 443-444 (1996); sec. 1.104-1(c), Income Tax Regs.

Petitioners contend that $800,000 is excludable from gross income under section 104(a)(2) because the settlement agreement

expressly allocated that amount to the tort claim for personal injuries. In support of their position, petitioners cite Glynn v. Commissioner, 76 T.C. 116, 120 (1981), affd. without published opinion 676 F.2d 682 (1st Cir. 1982), in which we stated that the most important fact in determining the purpose of the payment is "express language [in the agreement] stating that the payment was made on account of personal injuries." Petitioners further maintain that the settlement agreement should be respected by this Court because it was entered into in good faith between adverse parties at arm's length. On the other hand, respondent contends that no part of the settlement proceeds qualifies for exclusion as "damages received * * * on account of personal injuries" under section 104(a)(2). On that basis, respondent maintains that the entire amount of the settlement proceeds, or $1 million, is includable in petitioners' gross income. Respondent posits that the express allocation of the proceeds in the settlement agreement should be disregarded since the agreement was not entered into by the parties in an adversarial context at arm's length and in good faith. For the reasons set forth below, we agree with respondent.

We have had numerous opportunities to address the issue of the proper allocation of the proceeds of a settlement agreement in the context of section 104(a)(2). See, e.g., Robinson v. Commissioner, 102 T.C. 116 (1994), affd. in part, revd. in part and remanded 70 F.3d 34 (5th Cir. 1995); Horton v. Commissioner,

100 T.C. 93 (1993), affd. 33 F.3d 625 (6th Cir. 1994); Stocks v. Commissioner, 98 T.C. 1 (1992); Metzger v. Commissioner, 88 T.C. 834 (1987), affd. without published opinion 845 F.2d 1013 (3d Cir. 1988); Threlkeld v. Commissioner, 87 T.C. 1294 (1986), affd. 848 F.2d 81 (6th Cir. 1988); Bent v. Commissioner, 87 T.C. 236 (1986), affd. 835 F.2d 67 (3d Cir. 1987); Fono v. Commissioner, 79 T.C. 680 (1982), affd. without published opinion 749 F.2d 37 (9th Cir. 1984); Glynn v. Commissioner, supra; Seay v. Commissioner, 58 T.C. 32 (1972).

Where amounts are received pursuant to a settlement agreement, the nature of the claim that was the actual basis for settlement, rather than the validity of the claim, controls whether such amounts are excludable under section 104(a)(2). United States v. Burke, 504 U.S. 229, 237 (1992); Robinson v. Commissioner, supra at 126. Ascertaining the nature of the claim is a factual determination that is generally made by reference to the settlement agreement, in light of the facts and circumstances surrounding it. Knuckles v. Commissioner, 349 F.2d 610, 613 (10th Cir. 1965), affg. T.C. Memo. 1964-33; Seay v. Commissioner, supra at 37. In this regard, we ask "in lieu of what was the settlement amount paid"? Bagley v. Commissioner, 105 T.C. 396, 406 (1995). A key factor in that determination is the intent of the payor, or the payor's dominant reason, in making the payment. Robinson v. Commissioner, supra at 127; Britell v. Commissioner, T.C. Memo. 1995-264; see Agar v. Commissioner, 290 F.2d 283, 284

(2d Cir. 1961), affg. T.C. Memo. 1960-21; Metzger v. Commissioner, supra at 847-848.

Where the settlement agreement expressly allocates the settlement proceeds between tortlike personal injury damages and other damages, the allocation is generally binding for tax purposes (and the tortlike personal injury damages are excludable under section 104(a)(2)).  Bagley v. Commissioner, supra at 406; Robinson v. Commissioner, supra at 127; Threlkeld v. Commissioner, supra at 1306-1307; Fono v. Commissioner, supra at 694.  However, an express allocation set forth in the settlement is not necessarily determinative of the nature of the claim if the agreement is not entered into by the parties in an adversarial context at arm's length and in good faith, or if other factors indicate that the payment was intended by the parties to be for a different purpose.  Bagley v. Commissioner, supra at 406; Threlkeld v. Commissioner, supra at 1306-1307. Where the express allocation is not to be respected, other factors, which include the payor's intent and the background of the litigation, rise to the fore in determining the nature of the claim.  See Knuckles v. Commissioner, supra at 613; Eisler v. Commissioner, 59 T.C. 634, 640 (1973).

A.  The Settlement Agreement Was Not Entered Into by the Parties in an Adversarial Context at Arm's Length.

This Court has considered previously the circumstances under which we will and will not disregard specific allocations made in

a written settlement agreement. See, e.g., <u>Bagley v. Commissioner</u>, <u>supra</u>; <u>McKay v. Commissioner</u>, 102 T.C. 465 (1994), vacated and remanded per curiam without published opinion 84 F.3d 433 (5th Cir. 1996); <u>Robinson v. Commissioner</u>, <u>supra</u>; <u>Fono v. Commissioner</u>, <u>supra</u>; <u>McShane v. Commissioner</u>, T.C. Memo. 1987-151. Petitioners aver that the situation herein is almost identical to that in <u>McKay v. Commissioner</u>, <u>supra</u>, and is distinguishable from both <u>Robinson v. Commissioner</u>, <u>supra</u>, and <u>Bagley v. Commissioner</u>, <u>supra</u>, upon which respondent relies.

Robinson v. Commissioner, <u>supra</u>, involved an action initiated by the taxpayers in State court against a Texas bank for failure to release its lien on the taxpayers' property. After the jury returned a verdict in the taxpayers' favor for approximately $60 million, including $6 million for lost profits, $1.5 million for mental anguish, and $50 million in punitive damages, the parties settled. In the final judgment reflecting the settlement, which was drafted by the parties and signed by the trial judge, 95 percent of the settlement proceeds were allocated to mental anguish and 5 percent were allocated to lost profits. We held that the allocation in the final judgment did not control the tax effects of the settlement proceeds to the recipients because it was "uncontested, nonadversarial, and entirely tax motivated" and did not accurately "reflect the realities of * * * [the parties'] settlement." <u>Id.</u> at 129.

In Bagley v. Commissioner, supra at 410, we concluded that the express allocation of $1.5 million as damages for personal injuries provided for in the settlement agreement was not controlling, and we determined that $500,000 of that sum was to be allocated as punitive damages. The payor's primary concern was to pay as little as possible to dispose of all claims of the taxpayer. Moreover, we noted that it was clearly in the interest of both parties not to allocate an amount to punitive damages, despite the fact that the record showed that both parties had considered the strong possibility of petitioner's recovering punitive damages. Both parties worked on the terms of the settlement document, and the taxpayer had consulted a tax attorney concerning the allocation of the settlement proceeds.

In contrast with Robinson v. Commissioner, supra, and Bagley v. Commissioner, supra, in McKay v. Commissioner, supra, we found that the settlement was made by hostile parties who continued to be adverse with respect to the allocations to be made therein. We noted that the "allocation of the settlement proceeds between the wrongful discharge tort claim and the breach of contract claim was based on * * * counsels' estimates of probability of * * * success on the merits, recognition of the jury verdict, and mutual assessment of the total and relative values of the claims." McKay v. Commissioner, supra at 472.

In McKay v. Commissioner, supra, while the taxpayer wanted the settlement award to be as high an amount as possible to

compensate him for his losses, he also desired that the other party be punished for its behavior. However, the settlement agreement stated affirmatively that no amount was paid to the taxpayer to satisfy damages under RICO or to satisfy punitive damages claims. The taxpayer was never given free reign to structure the settlement allocation. See also Fono v. Commissioner, 79 T.C. at 694 (express allocation made in an earlier settlement agreement between Quaker Oats Co. (Quaker) and taxpayers was upheld as one entered into at arm's length and in good faith. The taxpayers sought an allocation of a portion of the agreed payment to personal injury--"damages for emotional distress"--but Quaker emphatically rejected that request.); McShane v. Commissioner, supra (express language in settlement agreement was respected where evidence in the record established that the inclusion of the language in the settlement agreements was the result of bona fide arm's-length negotiations and the tax consequences of the settlement were "never considered in the negotiations, but instead the settlement amounts were arrived at solely from a consideration by each party of the risks it would be subjected to by continuing the appeal.").

While not identical, we think that the facts of the instant case are similar to those of Robinson v. Commissioner, 102 T.C. 116 (1994), and Bagley v. Commissioner, 105 T.C. 396 (1995), and are distinguishable from those of McKay v. Commissioner, supra, McShane v. Commissioner, supra, and Fono v. Commissioner, 79 T.C.

680 (1982). While the underlying litigation was certainly adversarial, by the time the settlement agreement was executed on December 2, the parties were no longer adversaries. See Robinson v. Commissioner, supra at 133. An agreement in principle had already been reached on Thanksgiving Day, and was expressly referred to in the settlement agreement. The record reflects that Blount was not concerned with the amount of the settlement proceeds that was allocated to tortlike personal injury damages vis-a-vis other damages. As a result, petitioner in effect was able to unilaterally allocate the proceeds. The defendant's only concerns were that all of petitioner's claims be settled and that nothing be done to compromise the deductibility of the settlement to Blount. While not controlling, the deductibility of the payor's payment is a factor to be considered in determining whether the parties have adverse interests in regard to their allocations. See McKay v. Commissioner, 102 T.C. at 485. Indeed, we agree with respondent that, to the extent that such an allocation resulted in a larger net recovery to petitioner and had no corresponding negative impact on Blount, such allocation was equally favorable to Blount in that it aided its ability to resolve the lawsuit for the smallest settlement payment amount possible.

Moreover, as in Robinson v. Commissioner, supra at 129, and Bagley v. Commissioner, supra at 409, but unlike McKay v. Commissioner, supra at 472, the allocation did not accurately

reflect the realities of petitioner's underlying claims. As discussed above, neither party had any interest in ensuring that the allocation language accurately represented the risks of the various claims.

The attorneys for both sides felt that petitioner's contract and fraud claims were the strongest, and his tort claim of outrageous conduct among the weakest. Blount especially feared a runaway jury on punitive damages in the event that the case were remanded to State court, since Alabama juries were "known" for their large punitive damages awards. Despite the foregoing, the settlement agreement allocated 80 percent of the lump-sum proceeds to personal injury claims, only 20 percent to the contract claim arising out of the April 27 letter, and nothing whatsoever to the fraud claims and punitive damages claims. Thus, in contrast to McKay v. Commissioner, supra, the settlement agreement was not based on counsels' estimates of the probability of success on the merits had the case gone to trial. See McShane v. Commissioner, T.C. Memo. 1987-151. Moreover, we note that, unlike McShane v. Commissioner, supra, the tax effects of the allocation were considered by petitioner during the negotiations on December 2, 1991.

Contrary to petitioners' request, we shall not blindly accept the parties' allocation of settlement proceeds where, as here, the allocation is patently inconsistent with the realities of the underlying claims as determined by the attorneys for both

parties.  See Robinson v. Commissioner, supra at 129; cf. Fono v. Commissioner, supra at 696 ("We are not convinced that a weighing of the 'economic realities'--i.e., the merits of petitioners' claims * * *--is the standard to be applied where a taxpayer challenges the allocation in his own agreement.") (Emphasis added.)  To do so would effectively eviscerate the requirements of section 104(a)(2), and would allow taxpayers to exclude settlement proceeds from income at will in those instances where the payor is unconcerned with how the allocation is made.

B.  The Facts and Circumstances in the Instant Case Reveal That the Settlement Was Not on Account of Personal Injury Claims.

Having decided to look behind the express allocation made in the settlement agreement, we turn now to examine other factors, including the payor's intent and the details surrounding the litigation, to characterize the nature of the claim.  Robinson v. Commissioner, supra at 127; Threlkeld v. Commissioner, 87 T.C. at 1306.

Petitioners' attempt to characterize $800,000 of the $1 million payment as having been made on account of personal injuries is belied by the record.  See Glynn v. Commissioner, 76 T.C. at 120.  Other than petitioner's self-serving testimony and the conclusory testimony of his psychotherapist, which we do not find persuasive, there is no evidence before the Court that the defendants' actions caused petitioner to suffer emotional distress.  Petitioner was fired discreetly and suffered no undue

amount of attention.  Moreover, petitioner could not point to the interference of the defendants as the source of his difficulty in finding a new job.  Finally, petitioner testified that he had been seeing a psychotherapist for several years prior to his firing as a result of the deterioration of his marriage and problems with his children.  Compare Noel v. Commissioner, T.C. Memo. 1997-113 ("The evidence before the Court is that * * * [payor's] actions caused petitioner to suffer emotional distress") with Knuckles v. Commissioner, T.C. Memo. 1964-33 ("The doctor did not make a determination that * * * [taxpayer's] emotional condition was attributable to an act * * * on the part of * * * [the payor]").

In light of the facts and circumstances, we conclude that petitioner suffered no injury to his health that could be attributed to the actions of the defendants, and we are not persuaded that such injury was the basis of any payment to him by Blount.  See Knuckles v. Commissioner, 349 F.2d at 610.  Rather, while the settlement agreement ostensibly sought to settle all of petitioner's claims, Blount's dominant reasons for payment were to avoid a large punitive damages award as well as to avoid losing on the contract claim arising out of the April 27 letter at trial.  Settlement proceeds recovered under either of these claims are not excludable from income under section 104(a)(2).  Accordingly, we sustain respondent's determination in the notice

of deficiency with respect to the inclusion of an additional $800,000 of the lump sum as gross income.

III.  Deductibility of Legal Fees and Costs

As we have often stated, deductions are a matter of legislative grace, and petitioners bear the burden of proving that they are entitled to any deductions claimed.  Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992).

Both parties agree that petitioner's legal fees and costs are deductible, if at all, under section 162 as expenses paid or incurred in the course of petitioner's trade or business.  However, the deductibility of petitioner's legal expenses must also be tested against section 265.

Section 265 provides in pertinent part as follows:

(a) GENERAL RULE.--No deduction shall be allowed for--

        (1) EXPENSES.--Any amount otherwise allowable as a deduction which is allocable to one or more classes of income * * * wholly exempt from * * * taxes imposed by this subtitle * * *

Since we held above that none of the settlement proceeds are excludable from income under section 104(a)(2), section 265 does not apply to disallow any portion of the otherwise deductible expenses.  Our inquiry, however, does not end here.  We must next consider whether petitioners' deduction must be itemized rather than taken on Schedule C.

Section 62, which defines AGI, lists the deductions from gross income which are allowed for the purpose of computing AGI

(above-the-line deductions).  Section 62(a)(1) states the general rule that trade or business deductions are allowed for such purpose only "if such trade or business does not consist of the performance of services by the taxpayer as an employee".  Consequently, for employed individuals, section 162 trade and business deductions are ordinarily itemized deductions.  Secs. 161 and 162; see Alexander v. Commissioner, T.C. Memo. 1995-51, affd. 72 F.3d 938 (1st Cir. 1995).  Work-related expenses incurred by an independent contractor, on the other hand, are deductible above the line under section 62(a)(1).

Petitioners contend that the legal fees and costs were incurred in petitioner's capacity as an independent contractor, rather than as an employee.  Petitioners state that respondent "has adduced no evidence to dispute * * * [petitioner's] independent contractor status."  Therefore, petitioners assert that the deductions are not itemized deductions but above-the-line Schedule C deductions.  Respondent, on the other hand, avers that petitioners have presented no evidence entitling them to deduct the expenses on Schedule C.  We agree with respondent.

The Code does not define the term "employee".  Whether the employer-employee relationship exists is a factual question. Weber v. Commissioner, 103 T.C. 378, 386 (1994), affd. 60 F.3d 1104 (4th Cir. 1995).  Among the relevant factors in determining the nature of an employment relationship are the following:  (1) The degree of control exercised by the principal over the details

of the work; (2) which party invests in the facilities used in the work; (3) the taxpayer's opportunity for profit or loss; (4) the permanency of the relationship between the parties; (5) the principal's right of discharge; (6) whether the work performed is an integral part of the principal's business; (7) what relationship the parties believe they are creating; and (8) the provision of benefits typical of those provided to employees. NLRB v. United Ins. Co. of Am., 390 U.S. 254, 258-259 (1968); Weber v. Commissioner, supra at 387; Professional & Executive Leasing, Inc. v. Commissioner, 89 T.C. 225, 232 (1987), affd. 862 F.2d 751 (9th Cir. 1988). No single factor is determinative; rather, all the incidents of the relationship must be weighed and assessed. NLRB v. United Ins. Co. of Am., supra at 258; Weber v. Commissioner, supra at 387.

The documentary evidence and testimony in the record indicate that, at all times, BERC treated petitioner as an employee and that petitioner regarded himself as such. Nevertheless, petitioners maintain that petitioner "did not incur these expenses in the course of his trade or business as an employee of BERC because he would not have been entitled to the commissions associated with the sale * * * as part of his regular salary". While this may be true, petitioners do not explain how this transposes petitioner's employee status into that of an independent contractor. The arrangement set forth in the April 27 letter was meant as an addition to petitioner's regular

salary, in order to entice petitioner to continue his employment with BERC pending its sale.

We find that petitioners have failed to meet their burden of proving that petitioner was anything other than an employee of BERC. Rule 142(a). Consequently, no amount of petitioner's recovery is allocable to business gross receipts. On that basis, we hold that petitioners must itemize their related deduction for legal fees and costs on Schedule A rather than deduct their expenses on Schedule C.

Section 67(a) imposes a 2-percent floor on the miscellaneous itemized deductions of individuals for all taxable years beginning after December 31, 1986. Miscellaneous itemized deductions are defined in section 67(b) as those itemized deductions that are not specifically enumerated in section 67(b). As section 162 itemized deductions are not included in section 67(b), they are limited by the 2-percent floor. Sec. 1.67-1T(a)(1)(i), Temporary Income Tax Regs., 53 Fed. Reg. 9875 (Mar. 28, 1988). Accordingly, we further hold that petitioners' deduction for legal fees and costs is circumscribed by the 2-percent floor under section 67(a). In addition, since petitioners' AGI was over $100,000 for the taxable year ended December 31, 1991, the amount of miscellaneous itemized deductions that they may claim is subject to the provisions of section 68.

We have considered all other arguments made by the parties and found them to be either irrelevant or without merit.

To reflect the foregoing and issues previously resolved,

<u>Decision will be entered</u>

<u>for respondent</u>.