**OCEAN DRILLING & EXPLORATION COMPANY on behalf of itself and its consolidated subsidiaries**

**v.**

**The UNITED STATES.**

No. 152–77.

United States Court of Claims.

June 13, 1979.

W. John Glancy, Dallas, Tex., for plaintiff; Vester T. Hughes, Jr., Dallas, Tex., attorney of record. Philip T. Billard and Hughes, Luce, Hennessy, Smith & Castle, Dallas, Tex., of counsel.

Kenneth R. Boiarsky, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant. Theodore D. Peyser, Jr., and Robert S. Watkins, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, COWEN, Senior Judge, and KASHIWA, Judge.

## ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND PLAINTIFF'S CROSS MOTION FOR PARTIAL SUMMARY JUDGMENT

KASHIWA, Judge.

This interesting case is an aftermath of the Supreme Court decisions in 1947 and 1950 which held that the federal government had paramount jurisdiction over the outer continental shelf lands. Louisiana leased and collected rents and royalties on part of the shelf lands prior to the decisions. After the decisions the federal government validated these leases as federal leases and collected the rents and royalties from them. The part of plaintiff's petition before the court relates to matters rising by reason of the changeover.

Plaintiff's claims contained in paragraphs V and VI of its 14-paragraph petition, seeking a refund of income taxes and interest paid, are the only claims presently before the court on cross motions for partial summary judgment. The claim contained in paragraph V presents the question of whether plaintiff's purported election under I.R.C. § 614(b) in 1964 was a valid election which would, pursuant to the election, permit plaintiff to compute its 1969 depletion deduction by treating certain mineral leases as separate properties for depletion purposes. The paragraph VI claim involves the question of whether certain payments plaintiff made to the United States on offshore mineral leases pursuant to 43 U.S.C. § 1335(a)(9) (1976) during 1969 are properly characterized as a royalty or as a severance tax for purposes of computing plaintiff's 1969 depletion allowance.

Defendant has filed a summary judgment motion on both issues. In plaintiff's response it conceded its claim founded upon

paragraph V of the petition [1] (the election issue) but cross moved for summary judgment on its paragraph VI claim (the characterization question). Thus, only the characterization question remains to be decided. We find there are no material facts in dispute regarding the characterization question. After careful consideration of the briefs and oral arguments presented, we find for defendant on that issue.

The facts necessary for our resolution of the characterization question are as follows. Plaintiff, Ocean Drilling & Exploration Company, is a Delaware corporation with its principal place of business at 1600 Canal Street, New Orleans, Louisiana. For its 1969 taxable year, the year in dispute herein, plaintiff and its subsidiaries timely filed a consolidated income tax return. On the return plaintiff treated certain payments totaling $385,922.11, which it paid to the United States during 1969 under the terms of offshore mineral leases, as a severance tax rather than as a royalty. The tax effect of this characterization of the payments was that plaintiff had a higher "gross income from the property" for depletion purposes; for the payments, when characterized as a severance tax, are not subtracted from the income from the mineral leases in arriving at the "gross income from the property." Had the payments been characterized as a royalty, they would have to have been subtracted from the income from the mineral leases in arriving at the "gross income from the property." I.R.C. § 613(a); *Helvering v. Twin Bell Oil Syndicate*, 293 U.S. 312, 55 S.Ct. 174, 79 L.Ed. 383 (1934). And since the "gross income from the property" is the base against which the applicable depletion percentage is multiplied to arrive at the amount of the depletion allowance, plaintiff's characteriza-

tion of the payments as a severance tax naturally resulted in a larger depletion allowance for plaintiff than had the payments been characterized as a royalty payment. I.R.C. § 613(a).

On audit of plaintiff's 1969 tax return, the IRS recharacterized the $385,922.11 of payments as a royalty payment. This recharacterization, in turn, caused plaintiff's "gross income from the property" to be smaller and, hence, entitled plaintiff to a smaller depletion allowance. Accordingly, the IRS asserted a deficiency against the plaintiff for federal income taxes and interest due for taxable year 1969. Plaintiff paid the asserted deficiency and interest and filed a timely refund claim. After the refund claim was formally disallowed by the Commissioner, plaintiff filed a timely petition in this court.

The offshore mineral leases under which the payments involved herein were made cover lands on the continental shelf off the coast of Louisiana. The history of the leases is unique in that they were initially issued by the State of Louisiana. And the State of Louisiana originally collected a royalty and severance tax on the oil produced from these leases. Subsequently, in a trilogy of cases, *United States v. California*, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947); *United States v. Louisiana*, 339 U.S. 699, 70 S.Ct. 914, 94 L.Ed. 1216 (1950); and *United States v. Texas*, 339 U.S. 707, 70 S.Ct. 918, 94 L.Ed. 1221 (1950), the Supreme Court held the federal government had jurisdiction over the outer continental shelf lands, rather than the various states. Thus, the states had no power to lease outer continental shelf lands, collect rents and royalties from such lands, or levy taxes on activities conducted on the outer continental shelf.

---

1. In its response plaintiff stated only that

   ODECO has chosen not to oppose the motion of the United States for partial summary judgment with respect to the issue presented in paragraph V of ODECO's petition.

   However, at oral argument in response to questioning by the court, defendant's attorney stated it was his understanding that plaintiff had

conceded the paragraph V claim and that it could be dismissed. Plaintiff's counsel did not assert the contrary when it was his turn to argue. Nor did either of the parties present argument on the issue. Thus, we treat the paragraph V claim as conceded and ready for dismissal without further consideration by this court.

After the Supreme Court decisions had settled the jurisdictional question, Congress enacted in 1953 the Outer Continental Shelf Lands Act, ch. 345, 67 Stat. 462 (codified at 43 U.S.C. §§ 1331 et seq. (1976)), to provide a legal framework in which future leasing, exploration, and exploitation of the outer continental shelf could be conducted. See H.R.Rep.No.413, 83d Cong., 1st Sess. 1, reprinted in [1953] U.S.Code Cong. & Admin. News, p. 2177. Congress also provided a procedure in the Act under which prior state leases, the status of which were rendered uncertain by the Supreme Court decisions, would be validated by the federal government, thus avoiding disruption among prior state lessees, their financial investments in their leaseholds, and the mineral production from these leaseholds. 43 U.S.C. § 1335 (1976). Among the conditions imposed by Congress in section 1335 for validation of the prior state leases were that the lessees under the leases agree to pay "a royalty to the [federal government] on oil and gas of not less than 12½ per centum * * * in amount or value of the production * * * from the lease," 43 U.S.C. § 1335(a)(8) (1976), (the same royalty previously paid to the various states by prior state lessees) and

> * * * an additional royalty on the production from the lease, less the United States' royalty interest in such production, a sum of money equal to the amount of the severance, gross production, or occupation taxes which would have been payable on such production to the State issuing the lease under its laws as they existed on August 7, 1953; [43 U.S.C. § 1335(a)(9) (1976).]

It was pursuant to section 1335 that the offshore mineral leases under which plaintiff paid the United States the $385,922.11 of payments in 1969, that we are to characterize, were validated.

The reason Congress inserted a bifurcated royalty provision in section 1335, although not clear from the face of the statute, was to prevent prior state lessees who subsequently had their leases validated under the Act from enjoying an economic windfall. 99 Cong.Rec. 4886, 6965–6967 (1953). Had Congress only required, as a precondition for validation, that the prior state lessees agree to pay the federal government the same royalty which had been previously paid to the various states (i. e., only provided for the royalty contained in subsection (a)(8) of section 1335), the prior state lessees, upon validation of their leases, would have enjoyed a windfall in the amount of the severance taxes they had previously paid to the states, in addition to the royalty. They would have enjoyed this windfall for there was no federal severance tax or equivalent thereof and the state taxes were expressly no longer applicable. 43 U.S.C. § 1333(a)(2) (1976). Congress did not want the prior state lessees to enjoy such an economic windfall. Instead, Congress wanted to leave these lessees in roughly the same economic position after their leases had been validated as they had been in prior to the passage of the Act. Therefore, section 1335 as finally enacted contained the bifurcated royalty provision (subsection (a)(8) covering the royalty previously paid to the various states and subsection (a)(9) covering the severance taxes previously paid to the various states) to prevent the prior state lessees from enjoying an economic windfall.

The issue for decision, as previously stated is, whether the $385,922.11 of payments plaintiff made to the United States under its offshore mineral leases, as required by 43 U.S.C. § 1335(a)(9) (1976), is a severance tax or a royalty for purposes of the federal income tax depletion allowance. Defendant contends the payments are a royalty for the very terms of subsection (a)(9) of section 1335 denominate them as a royalty—an "additional royalty" which was to be paid along with the regular royalty provided for in subsection (a)(8) of section 1335. Not only are the subsection (a)(9) payments denominated an "additional royalty," but in defendant's view they are a royalty in substance. And defendant maintains the mere

fact that, due to historical reasons, the amount of the "additional royalty" in this case is computed by reference to the method by which the severance tax was computed on oil produced in Louisiana at the time section 1335(a)(9) was enacted does not change this result.

Plaintiff counters that just because the $385,922.11 of payments made during 1969 was labeled an "additional royalty" in section 1335(a)(9) does not necessarily mean the payments are a royalty. Plaintiff contends the court must go beyond the bare terms of section 1335(a)(9) to determine whether Congress intended these payments to be a royalty or a severance tax. If the court looks at the historical origin of the payments, the method by which the amount of the payments was computed, and the legislative policy behind the enactment of subsection (a)(9) of section 1335, plaintiff contends the court will conclude the payments were really intended to be a severance tax or at least should be so treated for purposes of computing plaintiff's federal income tax depletion allowance.

Since subsection (a)(9) of section 1335 uses the term "additional royalty," defendant is well supported in its contention that what Congress intended by enacting subsection (a)(9) was for the collection of a royalty, rather than a severance tax. Certainly when Congress used the term "royalty" in subsection (a)(8) of section 1335, it meant royalty, rather than any state or federal tax; for state taxes were expressly made inapplicable to the outer continental shelf lands, 43 U.S.C. § 1333(a)(2) (1976), and the committee reports state that the 12½ percent royalty imposed by the subsection was "in addition to any taxes imposed by Congress." H.R.Rep.No.413, 83d Cong., 1st Sess. 5, reprinted in [1953] U.S.Code Cong. & Admin.News, p. 2180. And plaintiff does not contend otherwise with regard to the usage of the word "royalty" in subsection (a)(8) of section 1335.

A further indication that Congress intended the subsection (a)(9) payments to be treated as an additional royalty rather than as a severance tax is that the payments would continue at the same rate for the term of the lease no matter what the State of Louisiana might have done with respect to its severance tax. The statute fixes the additional royalty as the amount of the severance taxes "which would have been payable on such production to the State issuing the lease under its laws as they existed on August 7, 1953." The amount of the additional royalty to be paid to the United States would be the same even if, after August 7, 1953, the State of Louisiana had reduced its severance tax or even abolished it. The function of the Louisiana severance tax was merely to set the amount of the additional royalty payable to the United States; the fact that the royalty was determined on that basis did not convert it into a tax.

Plaintiff contends, however, that when Congress used the term "royalty" with the modifier "additional" in subsection (a)(9) Congress meant something very different—a severance tax. Therefore, plaintiff contends the $385,922.11 it paid to the United States under subsection (a)(9) should be treated as a severance tax for federal income tax depletion allowance purposes.

The general rule of statutory construction followed by this court is that the bare language of the statute is to be given its ordinary meaning "unless overcome by a persuasive showing from the purpose or history of the legislation." *Aparacor, Inc. v. United States*, 571 F.2d 552, 554, 215 Ct.Cl. 596, 600 (1978). This court has also observed that, no matter how clear the statute may appear on its face, there is certainly no rule of law forbidding a court from resorting to the purpose and legislative history of a statute to determine the intent of Congress in enacting the statute. *Hart v. United States*, 585 F.2d 1025, 1032, 218 Ct.Cl. ——, —— (1978); *see also Train v. Colorado Public Interest Research Group, Inc.*, 426 U.S. 1, 9–10, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976); *Cass v. United States,*

417 U.S. 72, 77–79, 94 S.Ct. 2167, 40 L.Ed.2d 668 (1974). However, as indicated in the *Aparacor* and *Hart* opinions, this court will not bend or strain the words of a statute to change its meaning unless there is a persuasive and clear showing that Congress did not intend for the letter of the statute to prevail.

There is nothing in the legislative history of subsection (a)(9) of section 1335 which indicates Congress intended to impose a severance tax, rather than a royalty, by enacting that subsection. Nor is there anything in the legislative history of the entire Act to indicate Congress ever considered the effects which the enactment of the Act would have upon the federal income taxes paid by lessees or the amount of depletion allowance they would be entitled to claim. And plaintiff admitted as much at oral argument.

Thus what plaintiff's argument is reduced to is that had Congress thought about the federal income tax ramifications of its altering the character of the amount of money extracted from the prior state lessees under subsection (a)(9) of section 1335 from a severance tax to a royalty, Congress would have provided that the character of these payments remain a severance tax for purposes of computing the lessees' federal income tax depletion allowance. This is so in plaintiff's mind because as above stated the legislative policy behind the enactment of subsection (a)(9) of section 1335 was to leave the prior state lessees in the same relative economic posture after their state leases had been validated as federal leases as they had occupied prior to the validation process. And manifestly this would not occur, if the lessees had their depletion allowance reduced, due to a change in the characterization of the payments collected under subsection (a)(9) of section 1335, thus increasing their overall federal income tax liability.

■ Although we agree with plaintiff that the legislative purpose behind the enactment of section 1335, and specifically subsection (a)(9) thereof, was to leave the state lessees in roughly the same economic position as they had previously enjoyed, we cannot agree that Congress intended for their economic posture to remain exactly the same. For us to so agree and accept plaintiff's contention in this case would require the court to place a strained judicial construction upon the term "royalty" as it is used in section 1335 and to impute to Congress the contradictory usage of that term in section 1335. We would be reading the term "royalty," when not modified by the word "additional," to have its ordinary meaning. However, when modified by the adjective "additional," "royalty" would take on a very different meaning—it would mean severance tax. We decline to place such a strained judicial construction on the word "royalty" as it appears in section 1335 or to impute such contradictory usage of that term to Congress absent a persuasive indication in the legislative history or purpose otherwise, which we do not find present here.

■ Our conclusion is not altered by plaintiff's remaining contentions either, whether they are viewed separately or cumulatively. First, plaintiff contends that because the additional royalty required by subsection (a)(9) in this case was computed by reference to the Louisiana severance tax as it existed upon the date the Act was enacted, an inference should be drawn that it was a severance tax, rather than a royalty. There are different ways in which the amount of a royalty will be computed, however, and merely because one is used rather than another does not alter the basic fact that a royalty is being collected. *See Louisiana Land and Exploration Co. v. Donnelly*, 394 F.2d 273, 276–278 (5th Cir. 1968). The parties to a lease are free to agree upon the method by which the amount of a royalty will be computed. And at oral argument plaintiff's counsel admitted that Congress had the power to impose an additional royalty, with the amount of it computed just as in subsection (a)(9), if Congress so desired.

Thus reduced, this contention also comes down to whether Congress intended to impose a royalty when it enacted subsection (a)(9) utilizing the term "additional royalty." And for the reasons already stated, we hold Congress did impose a royalty.

Plaintiff's last contention is that since its obligation to make the $385,922.11 of payments involved herein can be traced back to its prior Louisiana severance tax liability, the payments should be characterized as a severance tax. Plaintiff cites *United States v. Gilmore*, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963); *Arrowsmith v. Commissioner*, 344 U.S. 6, 73 S.Ct. 71, 97 L.Ed. 6 (1952); *Lyeth v. Hoey*, 305 U.S. 188, 59 S.Ct. 155, 83 L.Ed. 119 (1938), in support of this contention. These cases are all distinguishable for none involved a statutory characterization by Congress of the item or items in dispute. Here Congress has expressly characterized the payments as an "additional royalty" and that is how they must be treated unless there is a showing that that is not what Congress intended by using the words "additional royalty." No such showing has been made in this case.

## CONCLUSION

For the foregoing reasons, we conclude the Internal Revenue Service properly recharacterized the $385,922.11 of payments plaintiff paid to the United States during 1969 as a royalty, rather than a severance tax. And since plaintiff has conceded its paragraph V claim, defendant's motion for partial summary judgment on the claims set forth in paragraphs V and VI of plaintiff's petition is granted and those paragraphs of plaintiff's petition are ordered dismissed.