LTV STEEL COMPANY, INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 96–303 T.

United States Court of Federal Claims.

Oct. 16, 1998.

David A. Hickerson, Weil, Gotschal & Manges, LLP, Washington, D.C., for plaintiff.

Thomas D. Sykes, United States Department of Justice, Washington, D.C., for defendant.

## OPINION & ORDER

HODGES, Judge.

### INTRODUCTION

Plaintiff LTV Steel Company, Inc. seeks to recover over $25 million in employee and employer Federal Insurance Contribution Act (FICA) and Federal Unemployment Tax Act (FUTA) taxes on certain pension payments made to its retirees for the tax years 1987 through 1993. The payments were made as partial replacement of pension payments lost when tax-qualified pension plans were terminated by the Pension Benefit Guaranty Corporation. We grant plaintiff's motion for summary judgment.

### BACKGROUND

This dispute arises from the Pension Benefit Guaranty Corporation's termination of four pension plans (Terminated Plans) that paid pension benefits to former employees of two LTV subsidiaries.[1] The Terminated

---

1. The four pension plans in issue are (1) a pension agreement between Republic Steel and the United Steelworkers of America (USWA); (2) a pension plan for salaried employees of Republic Steel; (3) a pension agreement between Jones & Laughlin Steel and the USWA; and (4) a pension

Plans were not subject to FICA or FUTA taxes. As statutory trustee, the PBGC began paying guaranteed "basic benefits"[2] to then-current pensioners covered by the plans. The basic benefits paid by PBGC were less than those LTV had been obligated to pay under collective bargaining and other agreements that had existed between LTV and the retirees before March 24, 1983. The average retiree's loss was approximately $400 of a promised average benefit of $900 per month.

The United Steelworkers of America sought an injunction directing LTV to make up lost benefits to fulfill its obligations under a 1983 collective bargaining agreement. The 1987 settlement of that action included a commitment by LTV to pay the difference between the benefits required by the Terminated Plans and the basic benefit amounts that were being paid by PBGC. The 1987 settlement agreement provided that retirees would receive a monthly payment from LTV under a program called the Individual Account Trust, which would pay the difference between the full benefits and the basic benefits that the PBGC paid. Hourly and salaried workers retired as of the date of the plan termination received monthly payments ranging from 90 to 100 percent of the shortfall; those who retired after plan termination received 75 percent.

The PBGC restored three of the four Terminated Plans retroactively in 1987. The three restored plans began making full payments to the retirees. The Trust ceased making payments to the retirees covered by the three restored plans. One of the four plans was not restored by PBGC. Eligible retirees under that plan continue to receive Trust payments from LTV that cover the difference between the basic benefits provided by PBGC and the benefits due under the plan prior to termination. LTV paid FICA and FUTA taxes that it had withheld in August 1990, and filed for a refund of those taxes in December 1991.

## DISCUSSION

### I. Applicability of a Transition or Grandfather Rule

■ Plaintiff's chief contention is that the Individual Account Trust payments are FICA/FUTA tax exempt under now repealed retirement-related statutory exemptions for employment taxes that were grandfathered by a Transition Rule.[3] The Transition Rule left retirement-related exemptions in place for payments where: (1) there existed an agreement between a "nonqualified deferred compensation plan" and an individual; (2) the agreement provided benefits with respect to services performed by individuals before 1984 (for FICA taxes) or before 1985 (for FUTA taxes); and (3) payments were made pursuant to pension agreements that were in existence on March 24, 1983.[4]

plan for salaried employees of Jones & Laughlin Steel. Jones & Laughlin and Republic are subsidiaries of LTV Steel. In July 1986, LTV Corporation and 66 of its subsidiaries, including plaintiff, filed for reorganization under Chapter 11 of the Bankruptcy Code. The United States District Court for the Southern District of New York, responding to an application under section 4042 of ERISA, 29 U.S.C. § 1342(a)(4) by the PBGC, terminated the Republic Salaried Plan. In 1987, the District Court took the same action with respect to the Republic Hourly and the J & L Hourly and Salaried Plans. *See PBGC v. LTV Corp.*, 875 F.2d 1008, 1011 (2d Cir.1989); *rev'd on other grounds*, 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990).

2. "Basic benefits" did not include such benefits as early retirement, disability and surviving spouse benefits or benefits paid to persons who retired early due to a plant shutdown or who were guaranteed pension benefits in excess of the PBGC's maximum monthly payout.

3. The retirement-related exemptions were repealed by the Social Security Amendments of 1983 ("1983 Amendments"). *See* Pub.L. No. 98–21, § 324(d)(4), 97 Stat. 65, 126 (1983) (codified at 26 U.S.C. § 401).

4. The Internal Revenue Code, 26 U.S.C. (I.R.C.) § 3102 (1994), requires every employer to deduct FICA taxes from employee wages, and I.R.C. § 3111 (1994) imposes matching FICA taxes on the employer. I.R.C. § 3301 (1994) imposes an additional FUTA or unemployment tax on employers only.

I.R.C. § 3121(a)(5)(A) (1994) exempts from FICA "any payment made to, or on behalf of, an employee or his beneficiary from or to a trust described in section 401(a) which is exempt from tax under section 501(a) at the time of such payment...." This is the source of a remaining exemption from FICA and FUTA taxes applied to retirement payments made to or from "tax-qualified" retirement plan trusts. Three other exemp-

Plaintiff contends that all three conditions are satisfied here. The Transition Rule grandfathers the repealed retirement-related FICA/FUTA tax exemptions, and therefore the exemptions should apply, according to plaintiff. We discuss the three elements below.

A. Whether the Pre–1983 Agreements Are Agreements Between "Nonqualified Deferred Compensation Plans" and Individuals

Defendant disputes this requirement of the Transition Rule on two grounds: (1) The plan in question does not constitute a "nonqualified deferred compensation plan," and (2) The USWA does not constitute an "individual" within the meaning of the rule.

1. Whether the Plan is a "Nonqualified Deferred Compensation Plan."

Defendant points out that a "nonqualified deferred compensation plan" under I.R.C. § 3121(v)(2)(C) is any plan *other* than "one in which payments are made to an employee from certain trusts, annuity plans, *pensions*,

exempt government deferred compensation plans, supplemental pension benefits, and 'cafeteria plans.'" According to defendant, the four qualified plans at issue in this case are pension plans, so they cannot be nonqualified deferred compensation plans. Therefore, the Transition Rule does not apply.

Plaintiff contends that its plan qualifies as a "nonqualified deferred compensation plan" under the language of the rule itself. The Transition Rule provides that: "For purposes of this [Transition Rule], *any* plan or agreement to make payments ['on account of' or 'because of retirement'] shall be treated as a nonqualified deferred compensation plan." Because the Trust was a "plan to make payments on account of retirement," it falls squarely within the definition set forth in the Transition Rule.

Plaintiff's interpretation is more persuasive. The Transition Rule was amended in 1984 to provide that for purposes of the rule, "any plan or agreement" to make the type of

---

tions were repealed by the enactment of the Social Security Amendments of 1983, but Congress enacted a "Transition Rule" that left those exemptions in place (according to plaintiff) for payments made with respect to services performed before January 1, 1984 (for FICA) or January 1, 1985 (for FUTA) pursuant to plans or agreements that were in existence on March 24, 1983. The Transition Rule states:

In the case of an agreement in existence on March 24, 1983, between a nonqualified deferred compensation plan (as defined in section 3121(v)(2)(C) of the Internal Revenue Code of 1954, as added by this section) and an individual—

(A) the amendments made by this section [to I.R.C. § 3121] (other than subsection (b)) shall apply with respect to services performed by such individual after December 31, 1983, and,

(B) the amendments made [to I.R.C. § 3306] by subsection (b) shall apply with respect to services performed by such individual after December 31, 1984.

For purposes of this paragraph, any plan or agreement to make payments described in paragraph (2), (3) or (13)(A)(iii) of Section 3121(a) of such Code (as in effect on the day before the date of the enactment of this Act) shall be treated as a nonqualified deferred compensation plan.

Pub.L. No. 98–21, § 324(d)(4), 97 Stat. 65, 126 (1983). The last paragraph of the quoted language was added by section 2662(f)(2)(C) of the Deficit Reduction Act of 1984, which amended

the Transition Rule. *See* Pub.L. No. 98–369, 98 Stat. 494, 1160 (1984) (codified at 26 U.S.C. § 3121 note).

Before the 1983 Amendments, I.R.C. § 3121 defined "wages" for purposes of FICA as follows:

(a) Wages. For purposes of this chapter, the term "wages" means all remuneration for employment . . . except that such term shall not include—

(2) the amount of any payment . . . made to, or on behalf of, an employee or any of his dependants under a plan or system established by an employer which makes provision for his employees generally . . . or for a class or classes of his employees . . . on account of—(A) retirement;

*   *   *   *   *   *

(3) any payment made to an employee . . . on account of retirement;

*   *   *   *   *   *

(13) any payment or series of payments by an employer to an employee or any of his dependants which is paid—

(A) upon or after the termination of an employee's employment relationship because of . . . retirement after attaining an age specified in the plan. . . . I.R.C. § 3121(a) (1982). The same exclusions were included in the definition of wages in I.R.C. § 3306(b) (1982) for purposes of FUTA, and were excluded from that definition by the 1983 Amendments, but with an effective transition date to taxable status one year later than that applied for FICA purposes.

payments paid by plaintiff (as described in paragraph (2), (3) or (13)(A)(iii) of section 3121(a)) *shall* be treated as a nonqualified deferred compensation plan. The language of the statute is clear on its face, so we look no further to determine its meaning, or in this case its application. The meaning of the words "any plan or agreement" is not ambiguous.

Defendant argues that the rule's plain meaning is undermined by a conflict between the definition of "nonqualified deferred compensation plan" in I.R.C. § 3121(v)(2)(C) (1994) and the definition set forth in the Transition Rule. Under I.R.C. § 3121(v)(2)(C) a "nonqualified deferred compensation plan" is "any plan or other arrangement for deferral of compensation other than a plan described in subsection (a)(5) [of I.R.C. § 3121]." Subsection (a)(5) [of I.R.C. § 3121] describes plaintiff's qualified pension plans. In defendant's view, this excludes them from the purview of I.R.C. § 3121(v)(2)(C) even if they are included within the scope of the Transition Rule. From this apparent conflict, defendant concludes that the applicability of the Transition Rule to the present situation is neither obvious nor inevitable.[5]

Plaintiff sees no conflict because "Section 3121(a) (as it existed before the 1983 Amendment) states a general definition of a nonqualified plan, while the definition added by the 1984 Deficit Reduction Act amendments states a specific rule that applies [f]or purposes of this paragraph." (citing Pub.L. No. 98-369, § 324(d)(4), 98 Stat. 1159). Congress was free to apply the Transition Rule to plans not otherwise covered by I.R.C. § 324.

Even if there were a conflict, a specific definition (here, a command) would take precedence over a more general definition. *See,*

e.g., *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *San Pedro v. United States,* 79 F.3d 1065, 1069–70 (11th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996); *N.L.R.B. v. A–Plus Roofing, Inc.,* 39 F.3d 1410, 1415 (9th Cir. 1994); *Mail Order Ass'n of America v. United States Postal Service,* 986 F.2d 509, 515 (D.C.Cir.1993); *Gallenstein v. United States,* 975 F.2d 286 (6th Cir.1992). Furthermore, the general provision upon which defendant relies was enacted in 1983, while the specific definition of "nonqualified deferred compensation plan" was added by the DEFRA Amendments in 1984. When two portions of the same law are applicable to the same issue, the later-enacted of the two portions prevails. *See, e.g., International Union, United Automobile, Aerospace & Agric. Implement Workers of America, Local 737 v. Auto Glass Employees Federal Credit Union,* 72 F.3d 1243, 1249 (6th Cir.), *cert. denied,* 519 U.S. 814, 117 S.Ct. 63, 136 L.Ed.2d 24 (1996); *United States v. Mohammed,* 27 F.3d 815, 820 (2d Cir.), *cert. denied,* 513 U.S. 975, 115 S.Ct. 451, 130 L.Ed.2d 360 (1994); *Parker North American Corp. v. Resolution Trust Corp.,* 24 F.3d 1145, 1151–52 (9th Cir. 1994); *Hellon & Assocs., Inc. v. Phoenix Resort Corp.,* 958 F.2d 295, 297 (9th Cir. 1992).

If it were necessary to consider legislative history to resolve a conflict or ambiguity in statutory terms, plaintiff's reading still would prevail. The Transition Rule applies to "agreement[s] provided for making payments upon retirement which would have been excluded from tax under prior law." JOINT COMMITTEE ON TAXATION, *General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 (H.R. 4170, 98th*

---

**5.** Regardless of whether plaintiff's pension plans constitute agreements under the Transition Rule or I.R.C. § 3121, plaintiff is correct that the retirement benefits in question were accrued not only under the pension plans, but also were to be paid under the collective bargaining agreements and other agreements that qualify as 'any plan or agreement' for purposes of the Transition Rule. Defendant's proposed findings of fact reflect recognition of this situation: "These plans ... were the payment mechanism for pension benefits promised in collective bargaining agreements and other agreements that were in existence on March 24, 1983." Thus, the other agreements entered into by plaintiff—the collective bargaining agreements and the agreements with the salaried retirees—appear to fall within the definition of a "plan or agreement" constituting a "nonqualified deferred compensation plan" mentioned by the Transition Rule. The Government presents no law to the contrary. Plaintiff's separate obligations are considered nonqualified deferred compensation plans under the Transition Rule.

*Cong., Pub.L. No. 98–369)*, at 1230 (Dec. 31, 1984) (joint committee print). Prior to the 1983 amendments retirement payments made under both qualified and nonqualified plans were "excluded from tax," so the Transition Rule applies to both equally.

2. Whether the Union is an "Individual"

Defendant argues that the Transition Rule, on its face, requires that the agreement be made between the employer and an *individual*, and that a union cannot qualify as an individual. Plaintiff contends that the union is an individual for purposes of the Transition Rule. The United Steelworkers of America was the union authorized to bargain on behalf of most workers at LTV Steel. Federal law forbids an employer from negotiating with an individual employee when the company has a recognized union.[6] Defendant's interpretation would preserve the retirement exemptions only for non-union retirees, and Congress would not have drawn such an arbitrary distinction, according to plaintiff. This court has applied the Transition Rule to a collective bargaining agreement between a union and an employer. *See Buffalo Bills, Inc. v. United States,* 31 Fed.Cl. 794, 802 n. 8 (1994), *appeal dismissed,* 56 F.3d 84 (Fed. Cir.1995) ("the 1983 [Social Security Act] Amendments contained a grandfather clause which provided that the old law still applies to payments made after December 31, 1983, if the payments were attributable to services performed on or before December 31, 1983 (for FICA purposes), on or before December 31, 1984 (for FUTA purposes), and were made pursuant to an agreement in existence on March 24, 1983").

We adopt the approach of *Buffalo Bills. See id.* The Transition Rule's requirement of an agreement between "nonqualified deferred compensation plans" and "individuals" is satisfied here.

B. Whether the Payments were Made Pursuant to Agreements that "Were in Existence" on March 24, 1983.

The next requirement of the Transition Rule is that the payments must be made pursuant to agreements in existence on March 24, 1983. The parties disagree whether the Individual Account Trust and the 1987 settlement agreement abrogated pension agreements in existence on March 24, 1983 or merely continued them. Plaintiff also argues that its obligation to make retirement payments was in existence on March 24, 1983 and could not be terminated, even after PBGC terminated the pension plans. Plaintiff argues that the Trust was merely a "payment vehicle" to fulfill the obligations of the pre–1983 pension agreements. The establishment of the Individual Account Trust did not give retirees any new benefits and did not replace the pre–1983 pension agreements, but merely continued them, according to plaintiff.

Defendant asserts the Trust payments were not paid "under agreements in existence on March 24, 1983" but were paid under the Trust. The Trust post-dates the effective date of the Transition Rule. Neither the Trust nor the 1987 Agreement existed on March 24, 1983. Neither the Trust nor the 1987 Agreement is a mirror image of the qualified plans or underlying pension agreements that were in place on March 24, 1983. Defendant notes several differences between the Trust and the qualified plans.[7]

Defendant also argues that even if the payments are made "under agreements in existence on March 24, 1983," the pension agreement in existence as of the effective date was the February 28, 1983 renegotiated pension agreement made pursuant to a three-year collective bargaining cycle. Therefore, the only FICA/FUTA tax exempt services are those which accrued between February 28, 1983–the last date prior to

---

6. *See* 29 U.S.C. § 159(a) (1994).

7. First, the benefits paid by the Trust covered only a portion of the benefits formerly paid by the qualified plans. Second, the 1987 settlement agreement made changes to certain medical and hospital insurance benefits for retirees. Third, the Trust was funded on a pay-as you go basis by

plaintiff, and was not funded to cover future benefits, as the qualified plans were designed to have been. Defendant also points to a 1986 settlement agreement between the Steelworkers Union and LTV that changed portions of the pension agreements.

March 24, 1983 that changes were made to the plans-and the effective statutory cutoff dates of the Transition Rule (January 1, 1984 for FICA and January 1, 1985 for FUTA).

Plaintiff responds that Congress would not have adopted a grandfathering provision so narrow that most accrued retirement benefits were excluded from its scope, while retaining the employment tax exemption on the fortuity of when the last change or amendment to the retirement plan occurred. Plaintiff argues that if defendant's position were adopted, it would lead to the absurd result that any change to a pension plan or trust payment vehicle, even if legally mandated, would result in forfeiture of the FICA/FUTA tax exemptions that Congress preserved for benefits that had accrued prior to March 24, 1983.

The key to this issue is the fact that LTV had a continuing obligation to pay accrued benefits after PBGC termination. *See generally In re Chateaugay Corp.*, 87 B.R. 779, 786 (Bankr.S.D.N.Y.1988) ("LTV Steel's obligations to fund and pay benefits continue[d] beyond any termination of the agreements themselves"), *aff'd*, 875 F.2d 1008 (2nd Cir. 1989), *rev'd on other grounds*, 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). As the court noted in *Pension Benefit Guaranty Corp. v. LTV Corp.*, "Collective bargaining agreements can establish a contractual obligation to provide pension benefits, following termination of a plan, in excess of the amounts guaranteed by PBGC. [The Employee Retirement Income Security Act of 1974][8] contains no restriction on the employees' rights to receive benefits not guaranteed under ERISA." 875 F.2d 1008, 1017 (2nd Cir.1989) (citing *Murphy v. Heppenstall Co.*, 635 F.2d 233, 237–39 (3d Cir.1980), *cert. denied*, 454 U.S. 1142, 102 S.Ct. 999, 71 L.Ed.2d 293 (1982)). At least with respect to the collective bargaining agreements, the possibility of continuing contractual obligations existed—providing the basis for judicial enforcement of those obligations. A like result obtains with respect to salaried employees. The payments at issue here were

made with respect to agreements that were in existence on March 24, 1993.

C. Whether the Agreement Provides Benefits with respect to Services Performed by Individuals before the Effective Dates of the Social Security Amendments.

Another requirement of the Transition Rule is that the agreement provide benefits with respect to services performed by individuals before 1984 (for FICA taxes) or before 1985 (for FUTA taxes). Defendant argues that FICA/FUTA tax attaches not when services are performed, but when wages are paid and received.[9] Plaintiff responds that Congress expressly changed these rules by leaving existing exemptions in place for benefits that had already accrued.

Under the Transition Rule, it does not matter when payments were made, but when the services underlying accrued benefits were performed. The payments at issue here were performed prior to the effective date of the 1983 amendments. The Rule provides: "In the case of an agreement in place on March 24, 1983, ... the amendments ... shall apply with respect to services performed by such individuals after December 31, 1983." Pub.L. No. 98–21, § 324(d)(4), 97 Stat. 126. Payments made to the retirees pursuant to the 1987 settlement agreement were made to satisfy obligations contained in the Pre–1983 Agreements. The Trust was merely the vehicle to fulfill those obligations. As plaintiff notes, "LTV Steel's obligations to make the retirement payments for benefits accrued under the pension plans could not be terminated." *See, e.g.,* ERISA § 203, 29 U.S.C. § 1053(a) (1994) (vested retirement rights are nonforfeitable); *Murphy v. Heppenstall Co.*, 635 F.2d at 237–38, 239; *see also Allied Chemical and Alkali Workers of America v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 183 n. 20, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971) ("Under established contract principles, vested retirement rights may not be altered without the pensioner's consent"); *In re Johnson Steel & Wire Co.*, 61 B.R. 203, 206 (Bankr.D.Mass.1986) (recognizing that non-union retirees were not precluded by

---

**8.** *See generally* Pub.L. 93–406, 88 Stat. 829 (codified at 29 U.S.C. § 1001 *et seq.*).

**9.** *See* Treas.Reg. § 31.3111–3; 31.3101–3 (1960).

ERISA from seeking to recover from their former employer the difference between PBGC-guaranteed benefits and those provided in terminated pension plans) (citing *Murphy*, 635 F.2d at 237, 239). This is confirmed not only by ERISA [10] and general principles of contract law, but is also suggested by the facts unique to LTV. *See, e.g., In re Chateaugay Corp.*, 87 B.R. 779, 786 (S.D.N.Y. 1988) ("LTV Steel's obligations to fund and pay benefits continue[d] beyond any termination of the agreements themselves"). If salaried employees merely "accepted the terms of the IAT arrangement and accepted the IAT payments" that does not diminish the fact that LTV had an obligation to pay benefits to them.

There is no serious dispute as to when the services were performed.[11] The agreements at issue provided benefits with respect to services performed before the effective dates of the social security amendments.

### D. Whether the IAT Payments are FICA/FUTA Taxable "Wages"

Defendant makes an additional argument unrelated to the strict mechanics of the Transition Rule. The Government contends that the Trust payments are "wages" subject to FICA/FUTA tax. After the 1983 Amendments, "wages" are "all remuneration for employment, including the cash value of all remuneration (including benefits) paid in any medium other than cash...." I.R.C. § 3121(a). FICA/FUTA taxes attach when wages are paid and received, according to defendant, so as "wages," all Trust payments were subject to FICA/FUTA at the time they were paid. However, Congress expressly limited the rule that employment tax attaches at the time payments are made by grandfathering the repealed exemptions. We disposed of a variation of this argument

above. Defendant's arguments are correct save for the specific applicability of the Transition Rule. The general rule concerning employment taxes' attaching at the time payments are made is altered by the grandfathering provisions of the Transition Rule.

### II. Other Grounds for Exemption

Plaintiff makes various arguments for tax exemption independent of the above arguments regarding the Transition Rule. We address two of them below.

### A. Origin of the Claim Doctrine

■ Plaintiff argues that because the Individual Account Trust payments were made as substitutes for benefits that were exempt from FICA/FUTA taxes, and paid in settlement of claims asserted by the USWA to enforce the payment of those benefits, the Trust payments are exempt. *See generally United States v. Gilmore*, 372 U.S. 39, 43–44, 49, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963) (determining taxable status of a claim with regard to "the origin and nature of the claims themselves"). In determining whether an award of damages or the settlement of a claim is subject to taxes, courts have focused on the nature of the claim underlying the recipient's damages award. *United States v. Burke*, 504 U.S. 229, 237, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1992) (citing *Threlkeld v. Commissioner*, 87 T.C. 1294, 1305, 1986 WL 22061 (1986), *aff'd*, 848 F.2d 81 (6th Cir.1988)).

In *Burke*, the Supreme Court ruled that in the employment discrimination context, "Congress declined to recompense Title VII plaintiffs for anything beyond the wages properly due them—wages that, if paid in the ordinary course, would have been fully taxable." *Id.* at 241, 112 S.Ct. 1867. As a result, the Court found that backpay awards

---

10. *See generally* 29 U.S.C. § 1132(a)(1)(B); 29 U.S.C. § 1132(a)(3)(b) (1994). Section 502 of ERISA provides that "[a] civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). ERISA also provides that a civil action may be brought "by a participant, beneficiary or fiduciary ... to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchap-

ter or the terms of the plan." *Id.* § 1132(a)(3)(B).

11. For retirees who retired during the roughly 30 years that the pre–1983 agreements operated prior to the 1983 amendments, their services were performed entirely before the effective dates of the amendments. Even with respect to the retirees who retired or will retire after 1984, a majority of them also performed most of their services before the effective dates.

received by taxpayers in settlement of their Title VII claims were not excludable from gross income as "damages received ... on account of personal injuries" under the Internal Revenue Code. *See id.* at 242, 112 S.Ct. 1867.

Defendant characterizes the payments as "additional" payments and not as "substitute" payments, however, and asks that the court treat the Trust payments as non-tax exempt. Plaintiff argues that the Trust payments are exactly the same as the foregone payments for which they compensate. Under plaintiff's "origin of the claim" theory, the Trust payments will be exempt if the court considers the payments to be a substitute for the tax-exempt benefits.

Defendant cites *Ocean Drilling & Exploration Co. v. United States* in support of its argument that the origin of the claim doctrine does not apply. 220 Ct.Cl. 395, 405, 600 F.2d 1343, 1349. In *Ocean Drilling,* the court distinguished a number of cases involving "origin of the claim" arguments because none of them "involved a statutory characterization by Congress of the item or items in dispute." *Id.* That is, where a statute itself establishes taxability or nontaxability, the origin of the claim doctrine is not applicable. Defendant apparently believes that this case involves such a statutory scheme, and that this scheme precludes recovery by plaintiff. We disagree, as the discussion above concerning the Transition Rule indicates.

Plaintiff's "origin of the claim" argument extends the doctrine into new territory. Justice Frankfurter noted that "payment which compensates for a loss of something which would not itself have been an item of gross income is not a taxable payment." *United States v. Kaiser,* 363 U.S. 299, 311, 80 S.Ct. 1204, 4 L.Ed.2d 1233 (1960) (Frankfurter, J., concurring). This is the context in which the doctrine normally operates.

These facts are undisputed: Payments made to retirees under the qualified pension plans prior to plan termination were not subject to FICA and FUTA taxes. Payments made in the interim period by PBGC also were not subject to FICA and FUTA taxes. Payments made to retirees from the restored qualified plans were not subject to FICA or FUTA taxes. Even under defendant's preferred interpretation of the law, FICA and FUTA could be applicable only to the period during which PBGC paid basic benefits and plaintiff was making up most of the difference between those benefits and pre-termination benefit levels. Had the payments been made "in the ordinary course," absent PBGC termination of the plans or subsequent litigation to enforce plaintiff's obligations to provide benefits, no doubt the benefits provided would have been exempt from FICA and FUTA. The issue is whether compensation for loss of payments that are FICA and FUTA exempt should themselves be exempt. If this is an extension of the origin of the claim doctrine, we find that it is a reasonable one.

### B. Retroactive Restoration of Plans.

Plaintiff argues that the payments are exempt from FICA taxes because the qualified plans were restored by the Supreme Court on a fully retroactive basis.[12] Because the interim payments were treated as payments made from the restored plans, they are properly viewed as having been made under the restored plans, according to plaintiff. Once the plans were restored, they reverted to qualified plan status and therefore were exempt from FICA/FUTA taxes. Defendant disputes plaintiff's reading of the Supreme Court opinion, claiming that the opinion does not address the retroactive effect of the restoration or tax consequences under the restoration.

Defendant contends that plaintiff's use of the Supreme Court's ruling is irrelevant in absence of a collateral estoppel defense, which must be pleaded affirmatively under Rule 8(c) of this court. Without a collateral estoppel defense, findings of the opinion may be admitted as evidence, but not as conclusions. FED.R.EVID. 803(8). Plaintiff does not argue that the Supreme Court's opinion operates as an estoppel against the defendant,

---

12. *See Pension Benefit Guar. Corp. v. LTV Corp.,* 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990).

but that the opinion confirms its contention concerning the retroactive restoration of the three restored plans. The nature of the restoration is not a conclusion, but a finding not precluded in the absence of a collateral estoppel claim.

Plaintiff asks that we apply the *Pension Benefit Guaranty Corporation* case to find an independent reason for exempting the payments at issue here from FICA and FUTA taxes. Retroactive restoration of the plans is not independently dispositive, but supports our finding that the payments were made pursuant to a continuous, preexisting obligation to pay vested retirement benefits.

### III. The Closing Agreement

The May 1993 Closing Agreement between LTV and the IRS states, "[N]o amounts paid from any nonqualified plan [i.e., the Individual Account Trust] will be recharacterized as distributions from a qualified plan in determining the FICA taxes owed by LTV Steel or in determining the FUTA taxes owed by LTV Steel as a result of any payments made from the nonqualified plans." According to defendant, this means that plaintiff agreed not to recharacterize Individual Account Trust payments as distributions from a qualified plan. However, the next sentence of the Closing Agreement preserves plaintiff's right to recharacterize the payments: "Nothing in this paragraph shall prejudice the assertion of any claims by LTV in any appropriate forum relating to the characterization of the payments made from nonqualified plans."

### CONCLUSION

We find that the Transition Rule is applicable to the pension payments at issue. We also find that the payments are exempt from FICA and FUTA under the origin of the claim doctrine. Plaintiff's motion for summary judgment is GRANTED. Defendant's motion for summary judgment is DENIED. The parties will stipulate damages and advise the court within 30 days.