**LTV STEEL COMPANY, INC.,**
Plaintiff–Appellee,

v.

**UNITED STATES, Defendant–**
**Appellant.**

No. 99–5072.

United States Court of Appeals,
Federal Circuit.

June 12, 2000.

David A. Hickerson, Weil, Gotshal, & Manges LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief were Mary B. Hevener and Peter D. Isakoff.

Steven W. Parks, Attorney, Appellate Section, Tax Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Loretta C. Argrett, Assistant Attorney General, and Kenneth Green, Attorney.

Before CLEVENGER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and ·BRYSON, Circuit Judge.

BRYSON, Circuit Judge.

The government appeals the ruling of the Court of Federal Claims that pension payments made to certain former employees of the taxpayer's predecessor companies were exempt from tax liability under the Federal Insurance Contributions Act (FICA) and the Federal Unemployment Tax Act (FUTA). We conclude that the payments in question did not qualify for exemption, and we therefore reverse.

I

Plaintiff LTV Steel Company, Inc., (LTV Steel) is a subsidiary of LTV Corporation. LTV Steel was formed in 1984 from two other LTV Corporation subsidiaries, Republic Steel Corporation and Jones & Laughlin Steel, Inc. Republic Steel Corporation and Jones & Laughlin Steel, Inc., each maintained a defined benefit pension plan for their hourly workers. Those plans were the products of collective bargaining with the United Steelworkers of America. In addition, both Republic Steel Corporation and Jones & Laughlin Steel, Inc., maintained separate defined benefit plans for their salaried workers. All four plans were qualified plans under 26 U.S.C. § 401 and therefore were eligible for the benefits of the Employee Retirement Income Security Act of 1974 (ERISA), Pub.L. No. 93–406, 88 Stat. 829.

In 1986, LTV Corporation and 66 of its subsidiaries, including LTV Steel, filed a petition in bankruptcy court for reorganization under Chapter 11 of the Bankruptcy Code. The Pension Benefit Guaranty Corporation (PBGC) thereafter terminated the four pension plans that had paid pension benefits to former employees of Republic Steel Corporation and Jones & Laughlin Steel, Inc. At the time of the terminations, the four plans had unfunded liabilities totaling more than $2 billion. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 640–41, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990).

After terminating the plans, the PBGC began paying guaranteed basic benefits to the funds' beneficiaries as the statutory trustee. Those basic benefits were substantially less, on average, than the amounts LTV Steel had been paying to the beneficiaries under the plans themselves.

The Steelworkers union, which represented many of LTV Steel's employees, filed a complaint in the bankruptcy court seeking an injunction to force LTV Steel to make up the lost benefits under the two plans relating to hourly workers and thereby to fulfill its obligations under its 1986 collective bargaining agreement with the union. LTV Steel and the Steelworkers union settled that dispute in 1987. As part of the settlement, the parties agreed to establish the "LTV Steel USWA Pension Plan" effective January 13, 1987. Pursuant to that plan, LTV Steel agreed to make payments to an Individual Account Trust (IAT). Those funds would then be used to pay most of the difference between the basic benefits that the PBGC was paying and the level of benefits required by the two terminated plans for hourly workers. LTV Steel agreed to a similar arrangement for salaried workers, under which the beneficiaries of the two terminated plans for salaried workers would receive payments from a second IAT. Under the two IAT programs, those employees who had retired as of the date of the plan termination would receive payments making up 90–100% of the shortfall in benefits, and those employees who retired after the plans were terminated would receive payments making up about 75% of the shortfall.

LTV Steel established the IATs as nonqualified plans (*i.e.*, the IATs did not qualify as pension trusts under § 401 of the Internal Revenue Code, 26 U.S.C. § 401). LTV Steel subsequently explained that it had elected to use nonqualified plans to make the payments because of concern

about the legality of using qualified plans to make up the shortfall between the benefits that had been provided under the terminated plans and the basic benefits that the PBGC was paying to the terminated plans' beneficiaries. In addition, LTV Steel explained that the payments to the beneficiaries were less than 100% of what was owed under the terminated plans both because LTV Steel did not believe that it would be able to satisfy those obligations in full without jeopardizing its ability to emerge from Chapter 11 and because it feared that payment of the full amount owed to the retirees could jeopardize the continuation of the PBGC's payments to the beneficiaries of the terminated plans.

Despite LTV Steel's efforts to ensure that the PBGC would continue paying basic benefits to the beneficiaries of the terminated plans, the PBGC concluded that the IAT programs established under the 1987 settlement agreements constituted "follow-on" plans. The PBGC therefore directed that three of the four pension plans (all of the plans except the Republic Steel plan for salaried workers) be restored. The PBGC defines a "follow-on" plan as a new benefit arrangement, instituted after the termination of a qualified plan, that supplements the insurance benefits paid by the PBGC so as to provide the beneficiaries of the terminated plan substantially the same benefits they would have received had no termination occurred. The PBGC regards follow-on plans as abusive, because such plans result in the PBGC subsidizing an employer's ongoing pension program in a manner not contemplated by ERISA. *See Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 642, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990).

LTV objected to the PBGC's order that it restore the terminated plans, and litigation ensued. Ultimately, the Supreme Court held that the PBGC had properly characterized the IAT programs as follow-on plans, and it ruled that the PBGC was authorized to order restoration of the ter-

minated plans on that basis. *See Pension Benefit Guar. Corp.*, 496 U.S. at 656, 110 S.Ct. 2668. Accordingly, LTV Steel restored three of the four terminated plans, as directed by the PBGC, and it resumed making payments to the beneficiaries under those qualified plans. LTV Steel continued making payments to the Republic Steel salaried workers under the IAT program for salaried workers.

For the payments that LTV Steel made under the two IAT programs, LTV Steel paid FICA and FUTA taxes, although LTV Steel maintained that it was not legally required to do so. LTV Steel subsequently filed a claim for a refund of those payments and thereafter filed an action in the Court of Federal Claims seeking a refund of the FICA and FUTA taxes it had paid on the IAT benefit payments. The Court of Federal Claims agreed with LTV Steel and directed the government to refund the FICA and FUTA taxes. The government then took this appeal.

II

Before 1983, all payments to pension plan beneficiaries were exempt from FICA and FUTA taxes. *See* 26 U.S.C. § 3121(a)(2)(A), (a)(3), (a)(5)(A), (a)(13)(A) (1982). In that year, Congress changed the tax laws so that only qualified plans would continue to be exempt from FICA taxes. *See* Social Security Amendments of 1983, Pub.L. No. 98–21, § 324, 97 Stat. 65, 122 (repealing all of the above provisions except section 3121(a)(5)(A)). The following year, Congress made a parallel change in the tax laws to impose FUTA taxes on benefit payments from nonqualified pension plans. *See* Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 531(d)(1)(A), 98 Stat. 494, 884, 1160.

Although the 1983 and 1984 legislation imposed FICA and FUTA taxes on payments made from nonqualified plans, Congress enacted a "transitional rule," which provided that "in the case of an agreement in existence on March 24, 1983, between a nonqualified deferred compensation plan"

and an individual, FICA and FUTA taxes would not be imposed on payments made with respect to services performed before the end of 1983 (for FICA taxes) and 1984 (for FUTA taxes). Social Security Amendments of 1983, Pub.L. No. 98–21, § 324(d)(4), 97 Stat. 65, 126, as amended by the Deficit Reduction Act of 1984, Pub.L. No. 98–369, § 2662, 98 Stat. 494, 1160. The Court of Federal Claims ruled that under the transition rule the payments made from the IATs with respect to services performed before 1984 (for FICA taxes) and before 1985 (for FUTA taxes) were exempt from those two taxes.

The government's position is that the transition rule is inapplicable because the payments made under the IAT programs were not made "[i]n the case of an agreement in existence on March 24, 1983." The IAT programs do not qualify as agreements "in existence on March 24, 1983," the government argues, because they were set up in 1987 pursuant to the settlement agreements between LTV Steel, the Steelworkers union, and the LTV Steel retirees. Because the transition rule does not apply, and because the IATs were nonqualified plans, the government concludes that the payments from the IATs are subject to FICA and FUTA taxes.

The Court of Federal Claims rejected that argument on the ground that LTV Steel "had a continuing obligation to pay accrued benefits after PBGC termination," and thus the payments made by the IATs "were made with respect to agreements that were in existence on March 24, 1983." LTV Steel agrees and argues that even though payments from the IATs were not made "pursuant to" a pre–1983 agreement, they were nonetheless made "in the case of" a pre–1983 agreement (the statutory language), because the payments from the IATs were made in settlement of LTV Steel's legal obligation to pay pension benefits under the pre–1983 qualified plans, even though those plans had been terminated by the PBGC.

■ We agree with the government. While it is true that the reason for the 1987 settlement agreements was to resolve LTV Steel's legal obligations to pay pension benefits, and while it is true that LTV Steel's original pension obligations stemmed from agreements or other undertakings that pre-dated the 1983 cut-off date, the payments at issue in this case were made pursuant to the 1987 agreements, not pursuant to the earlier pension plans, all of which had been terminated and were no longer paying benefits to any beneficiaries.

LTV Steel argues that the language of the statute, which refers to funds paid "[i]n the case of an agreement in existence on March 24, 1983," rather than funds paid "under" or "pursuant to" such an agreement, is broad enough to reach a case such as this one, in which the employees accrued rights under an earlier agreement but received benefits under a later agreement. That argument is not convincing. The payments at issue in this case were not made "in the case of" any pre–1983 agreement, but "in the case of" the 1987 settlement agreements. The 1987 agreements dictated the amount of the payments, the structure of the various benefits, the mechanism for funding the trusts, and the consequences of default. The 1987 agreements terminated the beneficiaries' rights under the pre–1983 agreements and replaced them with a new and significantly different set of rights under the IAT programs. At that point, the pre–1983 agreements became matters of only historical interest. Therefore, while the reason for the payments under the IAT programs ultimately derived from LTV Steel's obligations under the pre–1983 agreements, the payments cannot be said to have been made "[i]n the case of" any pre–1983 agreement.

LTV Steel's interpretation of the transitional rule, moreover, is inconsistent with the regulation that the Treasury Department has adopted for administering the rule. In referring to the trigger for FICA

liability, the regulation refers to benefits "paid under" an agreement that postdates March 24, 1983, *i.e.*, the regulation interprets the statutory reference to funds paid "[i]n the case of" a agreement post-dating March 24, 1983, as meaning funds "paid under" such an agreement. *See* 26 C.F.R. § 31.3121(v)(2)–2(c)(2).

■ When a term in the Internal Revenue Code is ambiguous, but is defined in a Treasury Regulation, we are instructed to defer to the Treasury Regulation as long as its interpretation of the Code is reasonable. *See Atlantic Mut. Ins. Co. v. Commissioner*, 523 U.S. 382, 389, 118 S.Ct. 1413, 140 L.Ed.2d 542 (1998); *Cottage Sav. Ass'n v. Commissioner*, 499 U.S. 554, 560–61, 111 S.Ct. 1503, 113 L.Ed.2d 589 (1991). The disputed language in the transitional rule certainly does not unambiguously favor LTV Steel's position, and the interpretation in the regulation is, at minimum, reasonable. Accordingly, to the extent that the statutory reference to a payment "[i]n the case of" an agreement post-dating March 24, 1983, is ambiguous, we must defer to the Treasury regulation, which interprets the statutory language to refer to a payment "under" such an agreement and thus supports the government's interpretation of the transitional rule.

LTV Steel argues that the government's reading of the transitional rule would deny the FICA and FUTA tax exemption to any nonqualified plan that was amended in any way after March 24, 1983, but that is clearly not so. The Treasury regulation relating to the transitional rule makes clear that an agreement in existence on March 24, 1983, "does not fail to be [such an agreement] merely because the terms of the plan are changed after March 24, 1983." 26 C.F.R. § 31.3121(v)(2)–2(b)(6). Thus, a pension plan does not fall outside the scope of the transitional rule simply because it is amended in some fashion after the date the transitional rule was enacted. Amending an on-going plan, however, is quite different from terminating a plan and resuming the payment of benefits under a new and different plan. Under ERISA, plans are frequently amended in response to statutory changes, economic conditions, and agreements between the parties, and the parties are free to amend plans within broad statutory limits. Termination, however, constitutes the death of a plan; it can be effected only in circumstances strictly defined by ERISA, and its consequences are prescribed in detail by the statute. *See* 29 U.S.C. §§ 1341(b), (c) (voluntary terminations); 1342 (terminations instituted by the PBGC); 1344 (allocation of assets following plan termination); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999).

In the instant case, the plans in existence on March 24, 1983, were terminated, not amended. Even though LTV Steel used the IATs to make the payments that settled all its obligations stemming from pre–1983 agreements, the IATs created in 1987 were new trusts, not simply amended continuations of pre–1983 plans. Accordingly, the benefits paid pursuant to the IATs were made pursuant to the 1987 agreements, not pursuant to plans that had been terminated during the previous year. For that reason, the transitional rule did not make any of those payments exempt from FICA and FUTA taxes.

### III

In addition to holding that the transitional rule applied to the payments from the IATs, the Court of Federal Claims held that the benefit payments made from the IATs were all exempt from FICA and FUTA taxes under the "origin of the claim" doctrine. Courts have invoked that doctrine to determine the proper tax treatment of a court award or settlement by focusing on the nature of the claim that led to the award or settlement. *See United States v. Burke*, 504 U.S. 229, 237, 112 S.Ct. 1867, 119 L.Ed.2d 34 (1995). The Court of Federal Claims held that because the IAT payments were designed to replace benefits that were exempt from

FICA and FUTA taxes, and because the IAT payments were the result of a settlement of claims to enforce those benefits, the IAT payments are likewise exempt.

■ The trial court misapplied the origin of the claim doctrine. The doctrine applies to cases in which the tax status of a settlement or award of damages is unclear. In *Burke,* for example, the question before the Court was whether backpay awards received in settlement of a discrimination action are taxable income, or excludable from gross income as "damages received ... on account of personal injuries." *Burke,* 504 U.S. at 230, 112 S.Ct. 1867. The Court looked at the purpose of the federal employment discrimination statutes and determined that Congress's intention was to compensate victims for their lost wages, and not to address "tort-like personal injury." *Id.* at 241, 112 S.Ct. 1867. Therefore, the amounts received in settlement of the plaintiff's discrimination claim were deemed to be taxable as part of the recipient's gross income. *See id.* at 242, 112 S.Ct. 1867.

In this case, by contrast, it is clear that if a taxpayer chooses to make pension payments made from a nonqualified trust, those payments are subject to FICA and FUTA taxes. While it is true that the payments would have been exempt from FICA and FUTA taxes if they had been made under the qualified plans, LTV Steel chose to use nonqualified trusts, rather than qualified trusts, to make up most of the disparity between the basic benefits that the PBGC was paying and LTV Steel's obligations under the pre–1983 plans. The consequence of that choice was to trigger liability for FICA and FUTA taxes, as the statute requires.

■ LTV Steel is not asking this court to use the origin of the claim to determine what tax treatment should be given to payments as to which the tax treatment is indeterminate. Instead, LTV Steel is asking the court to disregard the statutorily prescribed tax treatment of the payments in favor of a tax treatment that is reserved for a transaction that LTV Steel could have employed, but did not. Simply put, a payment that is specifically made subject to taxation is not rendered exempt from tax simply because it is made in settlement of an obligation which, had it been paid, would not have been taxed. *See Adkins v. United States,* 882 F.2d 1078, 1081 (6th Cir.1989) (lump sum settlement to compensate employees for employer's failure to make tax-exempt contributions to employee insurance trusts is taxable); *Harte v. United States,* 252 F.2d 259, 261–62 (2d Cir.1958) (annuity payments received under an agreement settling a will contest constituted taxable income from the property of an estate, even though settlement released plaintiffs' claims on the property of the estate and a distribution of the property of the estate would have been excluded from plaintiffs' gross income); *see also Ocean Drilling & Exploration Co. v. United States,* 220 Ct.Cl. 395, 600 F.2d 1343, 1349 (Ct.Cl.1979) (tax status of an obligation is not altered by the fact that it can be "traced back" to a prior liability that would have been entitled to more favorable tax treatment).

Any other conclusion would lead to results contrary to the purposes underlying the ERISA statutory scheme, which include encouraging the use of qualified plans by offering tax incentives to employers who establish such plans. Plainly, an employer acting after 1983 could not simply terminate a qualified plan, replace it with a nonqualified plan, and continue to enjoy FICA and FUTA tax exemptions for all benefits paid under the nonqualified plan. An employer should not be able to achieve those tax advantages simply by terminating its qualified plan and then, through the mechanism of a settlement agreement, replacing the qualified plan with a nonqualified plan. Reduced to its essentials, however, that is what LTV Steel claims it is entitled to do. The origin of the claim doctrine does not authorize the use of settlement agreements to recharacterize the tax status of transactions

in that manner and it is therefore inapplicable here.

## IV

Finally, LTV argues that the IAT payments should be exempt from FICA and FUTA taxes because the order directing the restoration of three of the qualified plans dictated that the restoration be fully retroactive. If the plans are to be treated as having been qualified plans all along, LTV Steel argues, the payments should be regarded as if they had been made from qualified plans as well. As the government notes, however, the exemption from FICA and FUTA taxes for payments from a qualified trust applies only if the trust is qualified "at the time of such payment." 26 U.S.C. § 3121(a)(5)(A). The payments at issue in this case were made from the IATs, which were not qualified trusts at the time the payments were made; the payments were therefore not exempt from FICA and FUTA taxes based on the fact that the original plans were later retroactively restored.

## V

While we reject the arguments that LTV Steel has made in its brief in defense of the judgment of the Court of Federal Claims, LTV Steel contends that it raised two other grounds for relief in the Court of Federal Claims, which the court found unnecessary to address. The parties have not briefed those issues, and the government has not suggested that they have been waived, so we leave the resolution of those issues to the Court of Federal Claims on remand.

*REVERSED AND REMANDED.*