Filed 5/13/25 (unmodified opinion attached)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| HOVIK NAZARYAN,<br><br>    Plaintiff and Appellant,<br><br>        v.<br><br>FEMTOMETRIX, INC., et al.,<br><br>    Defendants and Appellants.<br><br>BRIAN LARZELERE et al.,<br><br>    Defendants and Respondents. | G061412, G062027, G062179, G062307<br><br>(Super. Ct. No. 30-2018-00979038)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed April 23, 2025, be modified as follows:

On page 26, second sentence, under the disposition section, delete the following:

"Plaintiff shall recover his costs incurred on appeal."

And in its place insert the following:

"Plaintiff shall recover his costs incurred on the appeal filed by FemtoMetrix, Rubin, and Raphael. Rolfes and Larzelere shall recover their costs incurred on plaintiff's cross-appeal."

There is no change in the judgment.

The petition filed by defendants Tom Rolfes and Brian Larzelere for limited rehearing is DENIED.



SANCHEZ, J.

WE CONCUR:


O'LEARY, P. J.


SCOTT, J.

Filed 4/23/25 (unmodified opinion)

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

HOVIK NAZARYAN,

    Plaintiff and Appellant,

        v.

FEMTOMETRIX, INC., et al.;

    Defendants and Appellants.

BRIAN LARZELERE et al.,

    Defendants and Respondents.

G061412, G062027, G062179, G062307

(Super. Ct. No. 30-2018-00979038)

O P I N I O N

        Appeal from a judgment of the Superior Court of Orange County, Martha K. Gooding, Judge. Affirmed.

---

      [*] Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, II.B., III, and IV of the Discussion.

Shaumyan & Derbarseghian, Alfred Shaumyan and Aren Derbarseghian for Plaintiff and Appellant.

Schein Law Group, Joshua D. Schein; Liang Ly, Jason L. Liang; Greines, Martin, Stein & Richland, David E. Hackett, Gary J. Wax, and Rachel A. Beyda for Defendants and Appellants.

Schein Law Group, Joshua D. Schein; Liang Ly, Jason L. Liang; Greines, Martin, Stein & Richland, David E. Hackett, Gary J. Wax, and Rachel A. Beyda for Defendants and Respondents.

\*          \*          \*

The instant appeal arises out of a settlement agreement resolving a prior action between plaintiff Hovik Nazaryan and defendants FemtoMetrix, Inc. (FemtoMetrix), Alon Raphael, Tyler Rubin, Brian Larzelere, and Tom Rolfes. The settlement agreement said stock issued to plaintiff in settlement was not compensation, salary, or income for his services to FemtoMetrix. Instead, the parties would classify the settlement stock as "'Founder's Stock'" for plaintiff's "capital/equitable contributions . . . to the extent permitted by law." Defendants subsequently issued 1099-MISC forms (1099 forms) characterizing the settlement stock as non-employee compensation. Plaintiff initiated the underlying action alleging, among other things, defendants breached the settlement agreement and violated Internal Revenue Code section 7434 (26 U.S.C. § 7434)[1] by issuing the 1099 forms. The trial court held FemtoMetrix, Rubin, and Raphael breached the settlement agreement and issued fraudulent information returns under section 7434. But the court held Larzelere and Rolfes were not liable.

---

[1] All further statutory references are to the Internal Revenue Code unless otherwise stated.

2

Defendants raise four arguments on appeal. First, they contend only FemtoMetrix (not Rubin or Raphael) can be liable under section 7434. Second, they claim there is no substantial evidence they "willfully" filed fraudulent information returns as required under section 7434. Third, they argue plaintiff's breach of contract claim is barred by the civil litigation privilege under Civil Code section 47, subdivision (b) to the extent it is based on the 1099 forms filed with the Internal Revenue Services (IRS). Finally, defendants contend they could not have breached the settlement agreement because they had a duty to report the settlement stock.

Plaintiff also cross-appeals and argues the court erred by finding Rolfes and Larzelere were not liable for breaching the settlement agreement. Plaintiff insists the settlement agreement's stock classification provision imposed a joint and several promise. We disagree with both defendants' and plaintiff's contentions. For the reasons *post*, we affirm the judgment.

FACTS

I.

THE PARTIES

FemtoMetrix develops "metrology" tools used by the semi-conductor industry to test silica wafers for defects. Raphael was FemtoMetrix's president and chief executive officer while Rubin was chief financial officer. Larzelere was vice president of operations/business development and later the chief operations officer, and Rolfes was a member of the board of directors.

In 2012, FemtoMetrix recruited plaintiff to be its first engineer. In 2015, plaintiff sued defendants, claiming FemtoMetrix issued fewer shares of company stock to him than it had promised.

3

II.

THE SETTLEMENT AGREEMENT

In 2017, the parties entered into a settlement agreement (the Agreement) whereby they settled the 2015 action and agreed plaintiff would receive certain shares of FemtoMetrix stock. The parties extensively negotiated how they would classify the settlement stock. Plaintiff initially proposed classifying the stock as founder's stock and not compensation. FemtoMetrix's counsel disagreed and argued FemtoMetrix could not affirm the tax consequences of the settlement. FemtoMetrix attempted to delete the provision. A few days later, it proposed language suggesting the stock was provided for plaintiff's equitable contributions and plaintiff would have to pay any penalties assessed by taxing authorities against defendants for not reporting the stock as compensation. The latter language was never included in the Agreement.

The final Agreement included the following provision, which is central to the instant appeal: "The Parties hereby agree and acknowledge that *the Settlement Stock*, and any other stock issued by way of this Agreement, *is not 'compensation,' 'salary,' or 'income' for services performed by [plaintiff]. The Settlement Stock, and any other stock issued by way of this Agreement, is being provided to [plaintiff] as 'Founder's Stock' for his capital/equitable contributions to Femtometrix as alleged by [plaintiff] in the Action, and the Parties will classify it as such, for all purposes to the extent permitted by law*. The Parties further agree that, should any taxing authority determine that taxes should be assessed against any Party in connection with the shares issues [sic] or affirmed by this Agreement, each Party shall be solely responsible for any such taxes or interest assessed against them." (Italics added.)

4

## III.

### ISSUANCE OF THE 1099 FORM

In 2018, Rubin sent an e-mail to FemtoMetrix's certified public accountant (CPA) who also happened to be Rubin's cousin-in-law. In the e-mail, Rubin said he "need[ed] a little help with a 1099 *for a former contractor*." (Italics added.) Rubin explained: "We had a lawsuit settlement and I am confused about how to categorize the settlement." After reviewing the Agreement, the CPA indicated the Agreement said the settlement stock was "'Founder's stock,'" but the Agreement also said "the taxation of the stock issuance is classified 'to the extent permitted by law.'" The CPA believed the settlement stock had to be treated as compensation for services and reported on a 1099 form. The CPA further believed the reported shares should reflect the value at the time when plaintiff earned them.

Shortly after, FemtoMetrix's counsel informed plaintiff's counsel that FemtoMetrix intended to issue a 1099 form because its CPA advised it was legally required to treat the settlement stock as taxable income. FemtoMetrix's counsel invited plaintiff to respond with a countervailing opinion from an accountant or tax attorney. Plaintiff's counsel objected to the 1099 filing but did not provide a formal tax professional's opinion. FemtoMetrix's counsel then responded that FemtoMetrix would issue the 1099 form to comply with federal deadlines but agreed to amend the 1099 form if FemtoMetrix was wrong. Counsel again asked plaintiff for a countervailing opinion and suggested the parties could jointly hire an unaffiliated tax attorney for an opinion.

FemtoMetrix subsequently issued a 1099 form, reporting the cash and shares plaintiff was awarded under the Agreement as "Nonemployee Compensation." Rubin prepared the 1099 form.

## IV.

### PLAINTIFF'S COMPLAINT

In 2019, plaintiff filed the operative second amended complaint against defendants alleging five causes of action: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) fraudulent concealment; (4) fraudulent filing of information returns under section 7434; and (5) breach of fiduciary duty. Among other things, plaintiff alleged defendants breached the Agreement by misclassifying the settlement stock as compensation, failing to timely deliver certain documents under the Agreement, and disclosing the Agreement's terms to third parties. Plaintiff also alleged defendants willfully issued a fraudulent 1099 form by misclassifying the settlement stock.

## V.

### THE AMENDED 1099 FORM

After plaintiff sued, FemtoMetrix and its CPA firm discussed whether the settlement stock should be valued at the time it was transferred, which would increase the value of the stock. In April 2018, a CPA sent an e-mail to FemtoMetrix stating: "I feel we should be taking the position the 1099 should be valued on when the shares were transferred not when [plaintiff] earned them. [¶] It is my understanding the common stock was valued at $.03 per share in 2017, therefore the 1099 should be approximately $2,100,000. [¶] I am looking for some cases to support my position."

A few months later, FemtoMetrix's tax attorney requested the IRS provide an "Information Letter" or "Private Letter Ruling" addressing whether: (1) stock issued pursuant to a settlement agreement "issued for services rendered" should be classified as non-employee compensation; (2) the value of the stock should be determined on the date the stock was transferred

6

or when the agreement was entered into; and (3) the IRS is bound by a settlement agreement concerning tax issues. In November 2018, the IRS responded with a letter acknowledging the tax attorney had inquired "about the tax consequences of issuing stock to a service provider in exchange for services rendered." The IRS referred the tax attorney to section 83, which "provides rules for the taxation of property transferred to an employee or independent contractor in connection with the performance of services by such employee or independent contractor."

FemtoMetrix subsequently issued an amended 1099 form, changing the value of the reported shares to reflect their increased value at the time they were issued as opposed to when plaintiff earned them.

VI.

THE COURT'S STATEMENT OF DECISION

The matter proceeded to a bench trial, after which the court issued a statement of decision. The court found FemtoMetrix, Rubin, and Raphael (but not Rolfes and Larzelere) breached the Agreement by reporting the settlement stock as compensation on the 1099 forms and fraudulently filed information returns under section 7434. The court also found plaintiff failed to prove his claims for breach of the covenant of good faith and fair dealing, fraudulent concealment, and breach of fiduciary duty. It further held plaintiff failed to prove defendants had breached the Agreement by disclosing its terms to third parties.

A. *Breach of Contract Cause of Action*

In finding FemtoMetrix, Rubin, and Raphael breached the Agreement, the court emphasized the Agreement unambiguously said the settlement stock was *not* compensation, salary, or income for plaintiff's services but rather was provided as "'Founder's Stock' for his

7

capital/equitable contributions to Femtometrix . . . .'" The court rejected defendants' argument that they were legally required to report the shares as non-employee compensation. The court explained parties to a settlement agreement can agree on the tax allocation or characterization of settlement proceeds. Relying on a tax court decision, the court discussed why it believed the IRS would likely honor the Agreement's characterization of the settlement stock. First, the court held the Agreement expressly stated the stock was *not* compensation, income, or salary. Instead, the Agreement said the settlement stock was founder's stock issued for plaintiff's capital/equitable contributions. According to the court, this language was unambiguous so extrinsic evidence was irrelevant. The court therefore rejected defendants' contrary interpretations of the Agreement.

Second, the court found the parties extensively negotiated the Agreement's specific language and were adverse in terms of their taxing interests. FemtoMetrix's best interest was to characterize the shares as income to plaintiff so it could deduct the value of the shares as a business expense, but it was in plaintiff's best interest to characterize the shares as being issued for his capital contributions to benefit from a lower tax on capital gains. Third, the court noted the agreed-upon allocation had "some basis in the facts and circumstances surrounding the" Agreement. In the 2015 action, plaintiff alleged defendants promised he would receive shares like the other founders for his "equitable capital contributions" in the same amount as Larzelere.

Finally, the court rejected defendants' argument that the litigation privilege under Civil Code section 47, subdivision (b) barred plaintiff's contract claim. The court explained the first 1099 form was filed before any litigation and neither 1099 form was a complaint to the IRS or a

8

request for the IRS to investigate or remedy any wrongdoing. Instead, the court believed FemtoMetrix, Rubin, and Raphael filed the 1099 forms to harass and financially harm plaintiff.

## B. *Section 7434 Cause of Action*

The court next held plaintiff had proven his section 7434 claim against FemtoMetrix, Rubin, and Raphael. It found FemtoMetrix issued fraudulent 1099 forms "willfully, knowing of its duty to file accurate 1099 statements with the IRS, knowing it had specifically agreed the settlement stock issued to [plaintiff] was not compensation, salary or income for services rendered, and intending not only to mislead or defraud the IRS but also to harass" plaintiff.

The court likewise found Rubin and Raphael caused FemtoMetrix to issue the 1099 forms, knowing the forms were fraudulent because they were inconsistent with the Agreement's express language. The court noted it was Rubin's idea to issue the 1099 forms, and the court believed Raphael participated in the plan to increase plaintiff's tax burden. According to the court, Rubin would not have issued the 1099 forms without approval from Raphael because he was the chief executive officer, Rubin's direct supervisor, and "angry and bitter about the settlement . . . ." The court did not find credible Raphael's testimony that he was not involved in the decision to issue the 1099 forms.

Although FemtoMetrix received guidance from its CPA firm, the court held this did not preclude a finding of willfulness under section 7434 because the opinions "were not obtained in good faith." The court emphasized Rubin "did not describe [plaintiff] to [the CPA] as a co-founder, or as someone who made capital or equitable contributions to the Company." Instead, "Rubin deliberately described [plaintiff] as a 'contractor' because he knew

9

that would make it more likely [the CPA] would give him the advice he wanted: that the shares were reportable to [plaintiff] as taxable compensation for services rendered." The court believed the CPA gave the answer "Rubin expected and intended."

The court further disagreed with defendants' contention that they gave plaintiff a chance to dispute the 1099 form before it was issued. According to the court, "it was disingenuous for [FemtoMetrix's attorney] to insist on receiving a 'formal opinion' from [plaintiff's] accountant, when the conclusory advice the Company received from [its CPA] was anything but." The court added: "[G]iving [plaintiff] three business days to obtain a 'formal opinion' was hardly reasonable or evidence of a good faith effort to resolve any dispute."

Finally, the court noted other co-founders, including Rubin and Raphael, were given millions of shares for their capital contributions, but FemtoMetrix never issued a 1099 form for their shares. The court concluded Rubin and Raphael issued the 1099 forms to plaintiff "because they were resentful" and wanted to diminish the settlement stock's value.[2]

VII.

JUDGMENT

The court entered judgment in April 2022 and an amended judgment in December 2022. The parties appealed from both judgments and the court's fees and costs orders.

---

[2] The court provided some of its reasoning in its recitation of facts, which was incorporated into the court's legal analysis.

10

## DISCUSSION

### I.

### DEFENDANTS' MOTION FOR PARTIAL DISMISSAL

At the outset, we address defendants' motion to dismiss plaintiff's cross-appeal for lack of jurisdiction. Defendants filed their motion before the court had entered an amended judgment, arguing the April 2022 judgment was not final because the trial court did not determine plaintiff's damages. Defendants relied on the following language from the trial court's resolution of plaintiff's cause of action under section 7434(b): "Plaintiff . . . shall have and recover from Defendants Femtometrix, Inc., Alon Raphael, and Tyler Rubin an amount to be determined by the Court, which amount is equal to *the greater of $5,000 or the sum of (a) the actual damages sustained by Plaintiff . . . as a result of the filing of the fraudulent information return; and (b) the costs of this action* (which shall be determined based on a properly submitted memorandum of costs); *and* (c) in the Court's discretion, *reasonable attorney's fees*, the amount of and entitlement to which will be determined based on a post-trial motion for attorneys' fees." (Italics added.)

The above language did not render the judgment non-final. First, it is well settled a judgment is final even if costs and attorney fees are determined by post-trial motions. (*Amwest Surety Ins. Co. v. Patriot Homes, Inc.* (2005) 135 Cal.App.4th 82, 84 fn. 1 [denying the defendant's request to dismiss the appeal where the plaintiff appealed from the judgment rather than the modified judgment because "[t]he modified judgment added only prejudgment interest, costs, and attorney fees to the original judgment, and made no substantive changes to the earlier judgment which finally disposed of all legal issues between the parties"].) Second, the court determined plaintiff's actual damages. Indeed, in the underlying statement of decision,

11

the court held plaintiff was entitled to $3,000 in actual damages.[3] The judgment simply mirrored the language in section 7434(b), which authorizes a prevailing plaintiff to recover the greater of $5,000 in statutory damages *or* the sum of actual damages, costs, and attorney fees. Because plaintiff's actual damages were determined at the time of the judgment, the judgment was final and appealable. We accordingly deny defendants' motion for partial dismissal of the cross-appeal.

## II.

### THE SECTION 7434 CAUSE OF ACTION

*A.  Individual Liability*

Defendants argue the court erred by finding Rubin and Raphael liable under section 7434 because they did not "file" the 1099 forms. Relying on specific language contained in section 7434(a), defendants claim only FemtoMetrix, the payer responsible for reporting the stock payment, can be liable. We disagree.

1.  Standard of Review

"Issues of statutory interpretation are reviewed de novo. [Citation.] Our fundamental task in statutory interpretation, "'is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute." [Citation.] We begin as always with the statute's actual words, the "most reliable indicator" of legislative intent, "assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows

---

[3] In the subsequent amended judgment, the court reiterated plaintiff was entitled to $3,000 in actual damages.

more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy."'" (*Thai v. Richmond City Center, L.P.* (2022) 86 Cal.App.5th 282, 288.)

      2.  Split of Authority

Section 7434(a) provides: "If any person willfully files a fraudulent information return with respect to payments purported to be made to any other person, such other person may bring a civil action for damages against the person so filing such return." (Italics added.) The parties do not dispute the 1099 forms are "information returns" within the meaning of the statute. The central question is who can be liable under section 7434(a).

There is a split of authority among the federal courts as to whether liability is limited to the person required to file the information return or extends to those involved in preparing the return. Some courts limit liability to the person or entity required by statute to file the information return. According to those courts, the statute only authorizes a claim "against the person *so filing*" the return (§ 7434(a), italics added.) (*Bach v. Bach* (M.D. Fla., July 27, 2022, No. 8:21-CV-2964-SDM-TGW) 2022 WL 19914435, at p. *2; *Swallow v. Torngren* (N.D. Cal., May 14, 2018, No. 17-CV-05261-BLF) 2018 WL 2197614, at p. *13, aff'd. on other grounds (9th Cir. 2020) 789 Fed. Appx. 610; *Swartwout v. Edgewater Grill LLC* (W.D. Mich., July 12, 2013, No. 1:12-CV-130) 2013 WL 3655162; *Vandenheede v. Vecchio* (E.D. Mich., Feb. 26, 2013, No. 12-12284) 2013 WL 692876, at p. *3, affd. on other grounds (6th Cir. 2013) 541 Fed. Appx. 577.)

13

In addition to relying on the statute's plain language, some of these courts point to IRS regulations, which elsewhere define a "filer" as the person or entity required to file an information return and on whose behalf a return is filed. (*Bach v. Bach, supra*, 2022 WL 19914435, at p. *2; *Vandenheede v. Vecchio, supra*, 2013 WL 692876, at p. *3; see also 26 C.F.R. §§ 306.6721-1(h)(6) (2024) ["[T]he term filer means a person that is required to file an information return . . . ."], 1.6081-8(a) (2018) [distinguishing a "filer" from a "transmitter"].)[4]

Other courts apply a broader interpretation and extend liability to those who cause a fraudulent information return to be filed. The rationale of those decisions is that the plain language of the statute broadly imposes liability on "*any person* [who] willfully files a fraudulent information return" (§ 7434 (a), italics added) and was not intended to limit liability to filers. (*Flinn v. C Pepper Logistics LLC* (D. Kan., Jan. 11, 2021, No. 2:20-CV-02215-JAR-KGG) 2021 WL 97159, at p. *5; *Czerw v. Lafayette Storage & Moving Corporation* (W.D.N.Y., Nov. 9, 2018, No. 16-CV-6701-FPG) 2018 WL 5859525, at pp. *2–3; *Angelopoulos v. Keystone Orthopedic Specialists, S.C., Wachn, LCC* (N.D. Ill., May 15, 2015, No. 12-CV-05836) 2015 WL 2375225, at pp. *3–5; *Sigurdsson v. Dicarlantonio* (M.D. Fla., Dec. 11, 2013, No. 6:12-CV-920-ORL-TBS) 2013 WL 12121866, at pp. *6–8.) A few of these courts have reasoned their interpretation is consistent with legislative history, which indicates section 7434 addresses "'significant personal loss and inconvenience as the result of the IRS receiving fraudulent information returns . . . filed by

---

[4] The IRS regulations relate to different statutes concerning untimely and incorrect information returns or extensions of time to file certain returns. (26 C.F.R. §§ 306.6721-1(h)(6) (2024), 1.6081-8(a) (2018).)

14

persons intent on either defrauding the IRS or harassing taxpayers.'" (*Angelopoulos*, at p. *4; *Sigurdsson*, at p. *8.) These courts further emphasize a narrow construction would exempt culpable agents from liability, and Congress never used the word "filer" in section 7434. (*Angelopoulos*, at p. *5; *Sigurdsson*, at pp. *6–7.)

Considering the statute's plain language and the anomalous results of a contrary interpretation, we are persuaded by the latter cases. "[A] principal required to file a return and an agent who prepares the return and causes it to be filed are equally capable of causing 'significant personal loss and inconvenience'" and of "intending to 'defraud[ ] the IRS or harass[ ] taxpayers.'" (*Angelopoulos v. Keystone Orthopedic Specialists, S.C., Wachn, LCC*, 2015 WL 2375225, at p. *4.) Indeed, a corporate officer "'intent on either defrauding the IRS or harassing taxpayers'" through corporate returns "appears to be precisely the type of person whose conduct the legislative history addressed." (*Id.*) And "[c]ase law interpreting other federal statutes illustrates that corporate officer liability for torts (or criminal offenses) committed in a 'representative' capacity is the norm, not the exception." (*Sigurdsson v. Dicarlantonio*, 2013 WL 12121866, at p. *7.) For these reasons, the court did not err by finding Rubin and Raphael jointly and severally liable under section 7434. In reaching this conclusion, we do not suggest *all* individuals involved in preparing or assisting with an information return are *per se* liable. Instead, there must be some level of culpability, and imposing individual liability under the facts of *this* case is consistent with the statute's legislative history and plain language.

B. *Substantial Evidence Regarding Willfulness*

Defendants also contend there is no substantial evidence they acted willfully—i.e., they knew the 1099 forms were incorrect or fraudulent.

15

We find the evidence sufficient.

To prevail on a section 7434 claim, plaintiff must prove: (1) defendants issued an information return; (2) the return was fraudulent; and (3) defendants *willfully* issued the fraudulent return. (*Design Built Systems v. Sorokine* (2019) 32 Cal.App.5th 676, 685.) "Willfulness means more than just establishing . . . [defendants] were aware that the return was filed." (*Ibid.*) "'[W]illful filing' has been held to connote a 'voluntary, intentional violation of a legal duty' that requires 'intentional wrongdoing.'" (*Gidding v. Zurich American Insurance Company* (N.D. Cal., Nov. 9, 2015, No. 15-CV-01176-HSG) 2015 WL 6871990, at p. *6.) Plaintiff must show defendants "'aware of the duty purportedly imposed by Section 7434, specifically intended to flout the statute.'" (*Design Built Systems*, at p. 685.) "'"Courts have interpreted the term 'willfully' as requiring 'proof of deceitfulness or bad faith in connection with filing an information return.'"'" (*Ibid.*)

In applying the substantial evidence standard, we consider "the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor." (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 582.) "'[I]t is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, in support of the judgment." (*65283 Two Bunch Palms Building LLC v. Coastal Harvest II, LLC* (2023) 91 Cal.App.5th 162, 168.) A party "challenging a trial court's factfinding [accordingly] bear[s] an 'enormous burden . . . .'" (*Schmidt*, at p. 582.)

Viewing the evidence in the light most favorable to plaintiff, substantial evidence supports the court's finding that FemtoMetrix willfully

16

filed the fraudulent 1099 forms. In the Agreement, the parties agreed the settlement stock was *not* compensation, salary, or income for plaintiff's services. Instead, the parties agreed the settlement stock was provided as "Founder's Stock" for plaintiff's "capital/equitable contributions." It is undisputed Rubin and Raphael signed the Agreement and were aware of the above terms. But contrary to the Agreement's express terms, FemtoMetrix issued 1099 forms classifying the settlement stock as non-employee compensation. Rubin prepared the 1099 forms, and Raphael agreed with Rubin's decision to issue the 1099 forms. Although Raphael claimed he and Rubin did not discuss the need for plaintiff to pay taxes until after plaintiff filed the underlying action, the court found this testimony was not credible.

There also was evidence plaintiff was treated differently from other stock recipients. Rubin, Raphael, Rolfes, and Larzelere received millions of shares for their capital contributions or as gifts, and FemtoMetrix did not issue any 1099 forms for them. Finally, there was evidence Rubin and Raphael were very dissatisfied with the Agreement, which provides a possible motive to diminish the benefit plaintiff received from the settlement.

Defendants argue the Agreement was qualified because it said the settlement stock was "Founder's Stock" "to the extent permitted by law," the parties' negotiations show defendants were concerned about how they had to legally classify the stock, and they merely wanted to comply with the law by issuing the 1099 forms. They further claim there was evidence as to why FemtoMetrix did not issue 1099 forms for other individuals. According to defendants, the Agreement said plaintiff received shares for his "capital/equitable contributions," and "equitable" contributions could include labor. Defendants essentially point to different evidence or argue a different interpretation of the evidence. Even "'if two or more different inferences can

17

reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact.”’” (6*5283 Two Bunch Palms Building LLC v. Coastal Harvest II, LLC, supra*, 91 Cal.App.5th at p. 168.)

In any event, the trial court found defendants’ purported understanding of the Agreement and reason for issuing the 1099 forms were not credible. Indeed, the court noted FemtoMetrix did not provide a full and neutral disclosure of all facts to its CPA or the IRS. When communicating with the CPA, Rubin described plaintiff as a “contractor” rather than a co-founder or someone who made capital or equitable contributions. When communicating with the IRS, FemtoMetrix’s attorney described the settlement stock as being issued for services rendered, contrary to the Agreement’s terms. Finally, the court noted Rubin discovered FemtoMetrix was required to value the shares at a higher price in 2018 but did not rectify the supposedly unlawful valuation for more than two years when FemtoMetrix issued the amended 1099 form. It is not our role to reweigh the court’s credibility determinations. (*Orange Catholic Foundation v. Arvizu* (2018) 28 Cal.App.5th 283, 292.) Our job is to see if substantial evidence exists to support the judgment in favor of plaintiff, and we find that it does.

III.

THE BREACH OF CONTRACT CAUSE OF ACTION

*A. The Civil Litigation Privilege*

Defendants next argue plaintiff’s breach of contract claim premised on the 1099 forms is barred by the civil litigation privilege under Civil Code section 47, subdivision (b). According to defendants, they necessarily prepared and filed the 1099 forms in anticipation of official IRS proceedings. They claim 1099 forms assist the IRS with investigating

18

whether the recipient of payments reported the correct amount of earnings on his tax returns and with instituting enforcement actions. Defendants further contend they were "'participants authorized by law'" for purposes of Civil Code section 47, subdivision (b). Finally, they argue the 1099 forms were in furtherance of the object of a potential IRS proceeding and had a logical relation to those proceedings—i.e., ensuring plaintiff paid taxes he owed. As discussed *post*, we conclude the privilege does not apply to plaintiff's breach of contract claim.

Civil Code section 47, subdivision (b) confers a privilege on communications "'"(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that [have] some connection or logical relation to the action."'"' (*Tilkey v. Allstate Ins. Co.* (2020) 56 Cal.App.5th 521, 544.) "[T]he critical question is the *aim* of the communication, not the forum in which it takes place." (*Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, 368.) "If the communication is made 'in anticipation of or [is] designed to prompt official proceedings, the communication is protected.'" (*Ibid.*)

Assuming, without deciding, the litigation privilege applies to 1099 forms filed with the IRS, it does not bar plaintiff's contract claim. Whether the privilege applies to a breach of contract action "turns on whether [application of] the privilege furthers the purpose behind it based on the underlying facts." (*Timothy W. v. Julie W.* (2022) 85 Cal.App.5th 648, 664; see *Wentland v. Wass* (2005) 126 Cal.App.4th 1484, 1494; *Olson v. Doe* (2022) 12 Cal.5th 669 [declining to reach the question of whether the litigation privilege applies to contract claims].) "[T]he purpose of the litigation privilege is to ensure free access to the courts, promote complete and truthful testimony, encourage zealous advocacy, give finality to judgments, and avoid

19

unending litigation." (*Wentland*, at p. 1492.) The privilege also "'exists to protect citizens from the threat of litigation for communications to government agencies whose function it is to investigate and remedy wrongdoing.'" (*People ex rel. Gallegos v. Pacific Lumber Co.* (2008) 158 Cal.App.4th 950, 958.) We do not find any of these purposes would be furthered by application of the litigation privilege in this case. Plaintiff's breach of contract claim is based on a breach of a promise in the Agreement to not characterize the settlement stock as compensation, salary, or income. "The litigation privilege was never meant to spin out from judicial action a party's performance and course of conduct under a contract." (*Bardin v. Lockheed Aeronautical Systems Co.* (1999) 70 Cal.App.4th 494, 504.) As plaintiff correctly notes, allowing defendants "to breach the express terms of the [A]greement under the guise of the litigation privilege merely 'invites further litigation as to their accuracy and undermines the settlement reached' in the underlying action."

In arguing the privilege should apply to the breach of contract claim, defendants insist the Agreement did not "clearly prohibit the challenged conduct" because it said the stock was "Founder's Stock" "to the extent permitted by law." But parties to a settlement agreement can agree on the characterization of settlement proceeds. (*Lefleur v. C.I.R.* (T.C. 1997) 74 T.C.M. (CCH) 37, p. *6.) Indeed, "[i]f the settlement agreement expressly allocates the settlement proceeds to a type of damages, [the United States Tax Court] . . . will generally follow that allocation if the agreement was reached by adversarial parties in arm's-length negotiations and in good faith." (*NCA Argyle LP v. Commissioner of Internal Revenue* (T.C. 2020) 119 T.C.M. (CCH) 1364, p. *5 (*NCA Argyle*).) As noted *ante*, the trial court also found defendants' purported reliance on the "law" to be not credible. For

20

these reasons, the litigation privilege does not bar plaintiff's breach of contract claim.

## B. Alleged Duty to Report

Defendants similarly contend they did not breach the Agreement by filing the 1099 forms because they had a legal duty to report the settlement stock. First, they suggest the court overlooked the phrase "to the extent permitted by law" contained in the Agreement. Not true. The court extensively addressed and rejected defendants' argument that they were legally obligated to report the settlement stock as non-employee compensation. The court concluded: "[T]here was nothing improper – and certainly nothing illegal, as Defendants now suggest – about the parties' agreement to characterize the shares issued under the . . . Agreement to [plaintiff] as shares issued in exchange for his equitable/capital contributions . . . ." The court even analyzed why the IRS would likely accept the parties' agreed-upon characterization of the settlement stock.

Second, defendants claim the court did not analyze the realities of plaintiff's claim to determine whether or not the settlement stock was given for plaintiff's services despite the Agreement's language to the contrary. Not so. The court noted a settlement agreement is *not* determinative if it is incongruous with the realities of the underlying claim. The court then proceeded to explain the nature of plaintiff's claim—plaintiff agreed to provide engineering services, and defendants promised plaintiff would be treated as a "'founder'" and would be issued shares like the other founders immediately upon joining FemtoMetrix.

Finally, defendants argue characterization of a transaction for taxation purposes requires two-steps, and the court erred by not considering the necessary first step—the "origin of the claim from which the tax dispute

21

arose." According to defendants, the origin of plaintiff's claim shows the settlement stock was given to him for his services so FemtoMetrix had a legal duty to report those shares to the IRS. Defendants rely on plaintiff's complaint in the 2015 action and his testimony in the instant action. They claim the latter evidence establishes the shares were initially promised to plaintiff for his services before the parties had entered into the Agreement.

Under the "origin of the claim" test (a federal tax doctrine), the tax treatment of settlement proceeds is generally guided by the nature or "origin" of the claim. (*U.S. v. Gilmore* (1963) 372 U.S. 39; *LTV Steel Co., Inc. v. U.S.* (Fed. Cir. 2000) 215 F.3d 1275, p. *1280.) "Where there is an express allocation contained in the agreement between the parties, it will generally be followed in determining the allocation if the agreement is entered into by the parties in an adversarial context at arm's length and in good faith." (*Bagley v. C.I.R.* (T.C. 1995) 105 T.C. 396, 406.) But a settlement agreement's express allocation "is not . . . determinative if other facts indicate that the payment was intended by the parties to be for a different purpose." (*Ibid.*)

Here, the trial court did analyze the origin of plaintiff's claim. In fact, the court discussed plaintiff's claims in the 2015 action. The court explained plaintiff had alleged defendants promised him a partnership interest as a co-founder whereby he would receive the same number of shares as Larzelere *immediately upon joining* FemtoMetrix. The court acknowledged plaintiff's pleadings or discovery responses also referred to receiving shares for performing services, but the court emphasized at least one theory plaintiff pursued for several years was his claim that he would receive shares as a co-founder immediately upon joining FemtoMetrix rather than over time. Our review of the 2015 complaint confirms the court correctly interpreted the pleading.

22

Defendants suggest the court erred by relying on *NCA Argyle, supra*, 119 T.C.M. (CCH) 1364, which they claim does not mention the origin of the claim test. To the contrary, *NCA Argyle* states: "The tax treatment of proceeds received in settlement of a claim is generally guided by the nature of the claim. In other words, we look to the characterization of the claim for which the settlement was paid." (*NCA Argyle, supra,* 119 T.C.M. (CCH) at p. *5.) *NCA Argyle* also articulated three factors to determine the tax treatment of settlement proceeds: (1) the express language of the settlement agreement; (2) whether the parties were adversarial and negotiated at arm's length regarding the nature of the settlement payment; and (3) the economic realities of the underlying claim. (*Id.* at pp. *6–7.) The court did not err by analyzing these elements or overlook the nature of plaintiff's breach of contract claim. For the foregoing reasons, we are not persuaded by defendants' legal duty argument.

## IV.

### CROSS-APPEAL: ROLFES AND LARZELERE

In the cross-appeal, plaintiff argues the court erred by finding Rolfes and Larzelere were not liable for breaching the Agreement because the stock classification provision created a joint and several promise. Plaintiff emphasizes the "[t]he Parties" agreed the settlement stock would not be compensation, salary, or income for plaintiff's services. The Agreement likewise states the settlement stock was "'Founder's Stock' for [plaintiff's] capital/equitable contributions . . ., and *the Parties will classify it as such*, for all purposes to the extent permitted by law." (Italics added.) The Agreement defines the "Parties" as including plaintiff and the "FemtoMetrix Parties," which in turn is defined as including Rolfes and Larzelere. Thus, plaintiff concludes Rolfes and Larzelere are jointly and severally liable for breach of

23

the Agreement even though they had no involvement in issuing the 1099 forms. Not so.

At the outset, we note plaintiff objected to the court's proposed statement of decision and generally asked the court to conclude defendants were jointly and severally liable for breach of the Agreement. The court later requested supplemental briefing on the issue of "[w]hat legal authority" supported a finding that *Rubin and Raphael* were jointly and severally liable for breaching the Agreement. In a supplemental brief, plaintiff argued all defendants were jointly and severally liable because the Agreement's stock classification provision imposed joint and several liability. The court's final statement of decision did not address the latter argument. Instead, the court generally noted Rolfes and Larzelere had no role in issuing the 1099 forms or deciding the value assigned to the shares. They also had no idea there was any dispute until plaintiff sued. Although the final statement of decision omitted any findings regarding joint and several liability for breach of the Agreement, plaintiff did not object. Plaintiff could have, but did not, request any specific findings based on the supposed joint and several promise imposed by the Agreement's stock classification provision. Assuming the implied findings doctrine does not apply, we still disagree with plaintiff's contentions.

An obligation imposed upon several persons may be joint, several, or joint and several. (Civ. Code, § 1430.) Civil Code section 1659 provides: "Where all the parties who unite in a promise receive some benefit from the consideration, whether past or present, their promise is presumed to be joint and several." Civil Code section 1660 similarly provides: "A promise, made in the singular number, but executed by several persons, is presumed to be joint and several." These presumptions are rebuttable and can be trumped by

24

evidence showing the parties did not intend to impose joint and several liability. (*Douglas v. Bergere* (1949) 94 Cal.App.2d 267, 269; *Kaneko v. Okuda* (1961) 195 Cal.App.2d 217, 227.)

Here, plaintiff focuses on the phrase "the Parties," but other parts of the Agreement indicate the parties intended individual liability. Indeed, the last sentence of the stock classification provision contemplates that if taxes were assessed against any "Party" (singular) then that "Party" (singular) would be individually liable for such taxes. Rolfes and Larzelere also signed the Agreement as individuals and had no ability to take action with respect to stock issued by FemtoMetrix. For these reasons, we do not interpret the stock classification provision as imposing joint and several liability on Rolfes and Larzelere.[5]

---

[5] Our decision on defendants' appeal and plaintiff's cross-appeal does not affect the court's fees and costs orders.

## DISPOSITION

The judgment is affirmed. Plaintiff shall recover his costs incurred on appeal.


SANCHEZ, J.

WE CONCUR:


O'LEARY, P. J.


SCOTT, J.